346 A.2d 124.

RICHARD A. BELANGER *vs.* ARTHUR B. MATTESON *et al.*

OCTOBER 29, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is an appeal from a Superior Court

judgment vacating an arbitration award which had been granted under the terms of a collective bargaining agreement between the Warwick Teachers Union Local 915, AFT, AFL-CIO (Union) and the Warwick School Committee (School Committee).

The Union is the exclusive bargaining agent of all the teachers employed by the School Committee. Each year, as a result of negotiations between the Union and the School Committee a collective bargaining agreement is created which governs the conduct of the parties and those whom they represent for the coming year. The controversy in this case concerns, in part, the provisions of the contract which was in force from February 1, 1972 to January 31, 1973.

On June 22, 1972, the School Committee posted a notice of a vacancy for the position of Business Department Head at Warwick Veterans Memorial High School. The vacancy was a "promotional position" within the terms of the contract, and the notice was posted in compliance with its terms. Four teachers applied for the position, including plaintiff and one of the named defendants, Arthur B. Matteson. The candidates were interviewed, and their credentials reviewed by a committee of school administrators composed of the Assistant Superintendent for Secondary Education, the Principal of Veterans Memorial High School, and the Assistant Superintendent for Personnel. This committee unanimously recommended the appointment of Belanger to the vacant position. Its recommendation was in turn reviewed by the superintendent, who concurred in its decision. Finally, the matter was put before the School Committee who voted to appoint Belanger to the post.

Upon learning that he had been unsuccessful in his bid for the promotion, Matteson met with Mr. Venditto, the Assistant Superintendent in Charge of Personnel to dis-

cuss his dissatisfaction. This was his right under art. V, sec. 4(d) of the agreement. He did not obtain satisfaction from this discussion, and thereafter wrote to his union representative and requested the Union to invoke on his behalf the grievance procedures provided in the collective bargaining agreement. The core of Matteson's grievance rested with his belief that the School Committee had violated the agreement by appointing Belanger. Article V, sec. 4(b) provides that, "[c]andidates shall be recommended on the basis of qualifications for the position. Where qualifications are considered equal, seniority in the Warwick School System shall prevail." It is undisputed that Matteson has more seniority than Belanger. Throughout this controversy, Matteson and the Union have insisted that since Matteson was at least as equally qualified for the position as Belanger, the appointment should have been given to the senior person.

The School Committee appointed Belanger on August 1, 1972. On August 7, 1972, the Union filed a written notice of Matteson's grievance with the Assistant Superintendent in Charge of Personnel. The Assistant Superintendent met with Matteson and a union representative in early September. On October 11, 1972, he sent Matteson a letter notifying him that his decision was to retain Belanger in the post of department head. The Union followed the grievance procedures set forth in the agreement. It first placed Matteson's cause before the Superintendent and then went before the School Committee. Matteson, having had no success at the administrative level, requested the Union to take his complaint to arbitration. The Union met in executive committee and voted to initiate the arbitration.

A hearing was held on April 6, 1973 before three arbitrators, one selected by the School Committee, one by the Union, and the third chosen jointly by both sides from

lists prepared by the American Arbitration Association.

The issue submitted to the arbitrators by both sides was: "Has the Committee violated Article V, Section 4 (b) of the collective bargaining agreement by not appointing Mr. Arthur Matteson as Business Department Head at Veterans Memorial High School? If so, what shall the remedy be?"

The arbitration hearing lasted from 10 a.m. to approximately 6:30 p.m. A number of witnesses were presented by the Union and the School Committee. Both Belanger and Matteson testified as to their qualifications. All witnesses were subject to cross-examination. Briefs in support of the respective positions were submitted and on August 16, 1973 the arbitrators rendered a decision. They ruled that Matteson was entitled to the appointment as head of the Business Department.

After a full year on the job, Belanger found himself deprived of his promotion and back in the classroom. He wrote to his principal and the Union and requested that a grievance be filed on his behalf as he wished to challenge this demotion.

The Union president responded that, although the Union would be happy to file a grievance for him alleging that the School Committee had not adequately represented or protected his interest in his former position as department head, it would not ask for his reinstatement in that position because: "We [the Union] cannot, at this time, however, ask for a remedy which in effect would reverse a decision which was a result of a grievance filed by the Union. This would be illogical and inconsistent with our role as bargaining agent and our obligation under the contract. We have, after all, agreed to make binding arbitration the final step in our grievance procedure."

Thereafter, Belanger instituted this litigation in the Superior Court. He named as defendants Matteson, the

Union, the arbitrators, and the School Committee and asked the court to overturn the arbitrators' decision and reinstate him. His suit was based on 2 grounds: (1) that the arbitrators exceeded their jurisdiction, and (2) that the Union breached its duty to fairly represent his interests when it decided to pursue Matteson's grievance.

The trial justice found that there existed a duty of fair representation which the Union had breached, and that the award was in excess of the arbitrators' power and thus void. He vacated the award, and reinstated Belanger. Matteson and the Union appealed. We will first consider the duty of fair representation facet of this appeal and then go on to discuss the finding that, the arbitrators had exceeded their power by usurping duties and responsibilities which the Legislature has committed to the school committees of the various municipalities and nobody else.

The question of the duty owed by a union to its members is one of first impression in this court. It has, however, been extensively litigated in other jurisdictions, most notably in the federal courts, in cases arising under the National Labor Relations Act, 29 U.S.C.A. §151 et seq. (1973), the Labor Management Relations Act, 1947, 29 U.S.C.A. §141 et seq. (1973), and the Railway Labor Act, 45 U.S.C.A. §151 et seq. (1972).

The first of what has become a long line of cases was *Steele* v. *Louisville & Nashville R.R.*, 323 U. S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). There, the Court held that the Railway Labor Act, in providing that an organization chosen by the majority of employees would be the exclusive representative of all the employees within its class, mandated a concomitant duty "to act for and not against those whom it represents," and "to exercise fairly the power conferred upon it in behalf of all those for whom it acts * * *." *Id.* at 202, 203, 65 S.Ct. at 232, 89 L.Ed. at 183. This duty has also been found in unions

governed by the NLRB. *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 337, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1057 (1953). By taking away the right of individual employees to further their interests individually or to organize into numerous small units to deal with their employer, Congress has given a union power and control over the working lives of each of its members. A corollary of such power is the duty to act for the benefit of its members.

Our Legislature has created a structure of labor regulations which parallels in many significant respects the federal scheme. Our focus here is G. L. 1956 (1968 Reenactment) §28-9.3-1 et seq. entitled Arbitration of School Teacher Disputes. Section 28-9.3-1 declares it to be the public policy of this state to grant public school teachers the right to organize, to be represented, and to bargain on a collective basis with school committees relevant to "hours, salary, working conditions and other terms of professional employment." Section 28-9.3-3 mandates that the school committee recognize the labor organization chosen by the teachers to be their "sole and exclusive" bargaining agent. Thus, a labor organization representing teachers of this state has the same broad authority in the negotiation, administration, and enforcement of the collective bargaining agreement as does a union regulated by federal law. We find ourselves in agreement with the persuasive logic of the *Steele* opinion and its progeny, and, therefore hereby recognize, as implicit in our Act, a statutory duty on the part of an exclusive bargaining agent to fairly and adequately represent the interests of all of those for whom it negotiates and contracts, not only those who are members, but all those who are part of the bargaining unit.[1]

---

[1]General Laws 1956 (1968 Reenactment) §28-9.3-7 provides that teachers shall be free to decline to join an organization even if it is certified as the exclusive representative of all teachers within a unit. The union,

The union and its bargaining unit are necessarily composed of many individuals with diverse views and ofttimes conflicting employment demands. The whole purpose behind the creation of the union is, however, to present a solid, unified front to the employer. "In unity there is strength," went the old organizing slogan, and it was the truth. In dealing with the employer, the union gains its negotiating power from the fact that it speaks with one voice for all the employees.

That we find a duty on the part of the union does not, however, solve the controversy before us. We must define the parameters of the duty, and then apply it to the facts as found by the Superior Court.

We believe at the start that we must recognize that "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents * * *." *Ford Motor Co.* v. *Huffman, supra* at 338, 73 S.Ct. at 686, 97 L.Ed. at 1058. Recognizing that the interests of employees are often conflicting, the Court found that the union did not breach its duty to its members by bargaining for a seniority provision in the contract which favored some employees, but caused the layoff of others because of their newly lowered position on the seniority lists.

The union must be an advocate for its membership and where its members disagree, the union should not be forced into a neutral position by a court-enforced obligation not to take a stand. In *Humphrey* v. *Moore*, 375 U. S.

---

however, is still the sole representative for those who choose not to join its organization, and owes them the same duty as it does its dues-paying members. *Steele* v. *Louisville & Nashville R.R.*, 323 U. S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). We have approved a provision in collective bargaining agreements requiring teachers who are not members of the union to pay their proportionate share of the costs of the benefits conferred upon all members of the bargaining unit. *Town of North Kingstown* v. *Teachers Ass'n*, 110 R. I. 698, 297 A.2d 342 (1972).

335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), a multi-employer union found itself representing the employees of two trucking companies who were merging their businesses. The employees from the dissolved outfit had an interest in retaining their seniority within the absorbing company. That company's employees obviously did not favor such a happening. The contract signed by both employers and the union was ambiguous. The contract question was put before a joint labor-management committee. The union took the side of the absorbed employees, some of the other employees were "bumped" and they sued their union and their employer. The Court, expanding upon the *Huffman* holding, said:

> "Just as a union must be free to sift out wholly frivolous grievances which would only clog the grievance process, so it must be free to take a position on the not so frivolous disputes. Nor should it be neutralized when the issue is chiefly between two sets of employees. Conflict between employees represented by the same union is a recurring fact. To remove or gag the union in these cases would surely weaken the collective bargaining and grievance processes." *Id.* at 349-50, 84 S.Ct. at 372, 11 L.Ed.2d at 382.

Given these facts of life in the labor-management world, the duty of fair representation which is imposed on the union must not be such as to squelch union advocacy of position, nor must it weaken the union's ability to act when it does for all its members, even those whose interests may not be served but who are nonetheless bound by the majority vote. The entire scheme of federal and state labor regulations would be pointless if the minority in a union were not bound by the majority will. For example, what would be the efficacy of statutes requiring an employer to bargain *exclusively* with the duly elected union if the minority of employees who voted against ratification of a collective bargaining contract could then

turn around and require the employer to contract with them individually.

Whether or not the minority should be bound by the majority in the control of the conditions of their employment is not a matter for us to decide. The Legislature has unequivocally declared that to be the policy and we cannot say otherwise. However, concurrent with the union's power to bind the minority flows the duty which we define today.

In the negotiation process, we hold that a union must make an honest effort to serve the interest of all of its members, without hostility to any, and its power must be exercised in complete good faith and with honesty of purpose. *Ford Motor Co.* v. *Huffman, supra.*

Where the union and the employer have provided by contract for the internal settlement of disputes by means of grievance and arbitration procedures, and where these settlement procedures can be initiated and continued solely by the union, the union is likewise subject to a duty of fair representation in its handling of employee grievances. As in contract negotiations, the union as it deals with grievances must often take a position which is detrimental to some employees as it is helpful to others. The duty upon the Union here is to "* * * in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances," *Vaca* v. *Sipes,* 386 U. S. 171, 194, 87 S.Ct. 903, 919, 17 L.Ed.2d 842, 860 (1967), and, if it decides to pursue a grievance, it must not do so in a perfunctory manner.

Applying these standards of conduct to the facts of this case, we are faced with a clear breach by the Union of the duty it owed to Belanger. The testimony was undisputed, and the trial justice found that throughout the grievance procedure, the Union and its representatives acted without ever contacting Belanger or considering his qualifica-

tions for the position; the Union aligned itself with Matteson in seeking Belanger's removal; and at the arbitration hearing the union representatives attempted to demonstrate that Matteson, rather than Belanger, was entitled to the position.

The Union admitted at trial that it had no knowledge of Belanger's qualifications for the contested position until he testified at the arbitration hearing, and that it never contacted Belanger to discuss the impending challenge.

We have said a union may, and often must, take sides. But we wish to make it clear that it must act, when it does, in a nonarbitrary, nonperfunctory manner. Here the Union chose sides totally on the fortuitous circumstances of who the School Committee did not hire. It is true, in a very simplistic sense, that Matteson, being the only member of the bargaining unit with "a grievance," is therefore the only individual in need of Union support. But one would require blinders to accept this view. It should have been apparent to the Union that Matteson's grievance, although theoretically against the School Committee, was in reality against Belanger. Any action the Union took on Matteson's behalf threatened Belanger's job.

The Union had as much of an obligation to support Belanger as it had to support Matteson until such time as it had examined the qualifications of both candidates, and it believed that the seniority clause would control the selection process.

This was clearly a situation that was akin to the situations found in *Humphrey, Huffman,* and *Vaca* where a union faced with conflicting loyalties must make a choice as to which member it will support. To enforce a requirement of neutrality on the union in cases such as this would not, in our opinion, further the purposes of the statute which was designed to strengthen the power of

teachers in controlling their employment situation by allowing them all to speak through a single, but strong voice. Neutrality could only weaken the power of employees to deal with their employer. Even if in any particular grievance procedure neutrality would not be harmful,[2] the cumulative effect of such a stance taken over a period of time would undermine the position of the union as employee advocate in its dealings with the employer.

Also, by remaining neutral, the union would lose the ability to control the scope and focus of the arguments made on behalf of the employees. Professor Cox has argued that the settlement of an individual employee grievance involves more than the individual because precedent is established which will control the course of future employer-employee relations.[3] This distinguished educator also points out that any time the parties do battle over their contract, they are also engaging in a process of negotiation over its terms.

The Union must choose its side in a nonarbitrary manner, based on its good-faith judgment as to the merits of the conflicting claims. In the present case the Union never offered Belanger an opportunity to present his case to them. It never recognized its duty to independently determine whether Matteson or Belanger was entitled to the job. It seems to us that the only fair procedure in this type of a conflict is for the Union, at the earliest stages

---

[2]Cf. Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3d Cir. 1968). There, the court found it had jurisdiction to review a decision of a joint committee which the contract provided would be final and binding on the parties. It premised its power to review on the fact that the union had adopted a position of complete neutrality. Because of the unique composition of joint committees, i.e., equal representation by employers and union representatives, neutrality meant that the employer alone made the decision.

[3]Cox, Rights Under A Labor Agreement, 69 Harv. L. Rev. 601 (1956).

of the grievance procedure, to investigate the case for both sides, to give both contestants an opportunity to be heard, and to submit their qualifications to the Union. We are not mandating a full-blown hearing, replete with strict rules of procedure and adversary proceedings. If the Union investigates in an informal manner, this would be sufficient so long as its procedure affords the two employees the ability to place all the relevant information before the Union. *See Bures* v. *Houston Symphony Soc'y*, 503 F.2d 842 (5th Cir. 1974); *Waiters Union, Local 781* v. *Hotel Ass'n*, 498 F.2d 998 (D.C. Cir. 1974).

For a union to make a decision affecting its members without investigating the underlying factual situaton is a clear breach of the duty of fair representation. *De Arroyo* v. *Sindicato De Trabajadores Packinghouse, AFL-CIO*, 425 F.2d 281 (1st Cir. 1970). In an examination of the union's conduct in its discharge of its duty to the members of the bargaining unit, there are three possible foci for our analysis; the union's motives, its decision-making procedures, and the reasons for its acting as it did. A court's investigation into the first two questions is proper and necessary. We will, however, be more careful in any review of the merits of the Union's decision. An inquiry into the merits would open the way for our substituting our judgment for that of the Union, and that is not our role. It will be enough protection for an employee represented by a union if we inquire into motives and ensure that the union has fairly considered both sides before taking a stand.

In examining the record presented to us, we find no evidence of bad faith[4] by the Union. However, the Union's

---

[4]A number of courts have rejected the requirement that in order to find a breach of the duty of fair representation, the union's conduct must be not only arbitrary but also in bad faith. *De Arroyo* v. *Sindicato De Trabajadores Packinghouse*, AFL-CIO, 425 F.2d 281, 284, (1st Cir. 1970); *Beriault* v. *Local 40, Super Cargoes & Checkers I. L. & W. U., AFL-CIO,*

decision to press on with Matteson's grievance without making any effort to assess the relative qualifications of the respective candidates was patently defective. Thus, the Union breached its duty to represent fairly the interests of one of its members—Belanger.

Although we reach this conclusion in agreement with the trial justice, we cannot agree with the remedy he fashioned—the overturning of the arbitrators' award. Where the parties to a collective bargaining agreement agree to submit disputes as to the enforcement and effect of their contract to private grievance procedures, culminating in final and binding arbitration, such arbitrators' decisions are, except for a few very limited situations, unreviewable by the courts. *See United Steelworkers of America* v. *American Mfg. Co.*, 363 U. S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Legislature has mandated arbitration in conflicts arising in the negotiation process, this arbitration is declared by statute to be final and not appealable unless procured by fraud or in violation of the law. Section 28-9.3-12. The arbitration contemplated by this statute relates to the resolving of the substantive terms that will be part of a new contract. It does not embrace the settling of controversies which relate to the terms of an executed contract. This distinction between precontract and postcontract arbitration was pointed out in *Providence Teachers Union,*

---

501 F.2d 258 (9th Cir. 1974); *Gilstrap* v. *Mitchell Bros. Truck Lines,* Ore., 529 P.2d 370, 375 (1974). We, too, concur in the belief that a requirement of bad faith is an undue restriction on the duty of fair representation.

*Local 958* v. *School Committee,* 108 R. I. 444, 448, 276 A.2d 762, 765 (1971).

We are dealing here with a situation which arises in the postcontract phase of arbitration.

The trial justice in vacating the award because of the fair representation breach placed great emphasis on the case of *Clark* v. *Hein-Werner Corp., International Ass'n of Machinists, Local 1377,* 8 Wis.2d 264, 99 N.W.2d 132 (1959), where the court promulgated the proposition that "[e]mployees not fairly represented by the union should never be put in the position of having to solely depend upon the employer championing their rights under the collective-bargaining contract." *Id.* at 275, 99 N.W.2d at 138. If the court intended this pronouncement as an absolute, categorical inflexible rule, we cannot subscribe to its principle. There are exceptions to most, if not all, rules and, as will be seen, a union's failure in the area of fair representation does not automatically nullify an arbitration award.

Although owing no fiduciary duty to Belanger, the School Committee nonetheless forcefully argued his position because his and its position were coextensive. We do not have a situation like *Bieski* v. *Eastern Automobile Forwarding Co.,* 396 F.2d 32 (3d Cir. 1968), where the employees challenging the award did not have their position effectively represented. Here the employer and Belanger adopted the same stance before the arbitrators.

The employer has not caused Belanger any harm. The only wrong to Belanger was caused by his Union's breach of its obligation to him. He has a right to use the judicial process to remedy that wrong, but the remedy must be coextensive with the damage occasioned by the breach. And that damage does not necessarily encompass the loss of his job. The Union could have, consistent with its duty, still found Matteson to be the proper choice for

Business Department Head at Warwick Veterans High School. If it had reached such a decision by fair and proper means, the arbitration hearing would still have been conducted, and the award against Belanger would still have been granted. Thus, the Union's wrong here was not the direct cause of the adverse arbitration decision. This is not a situation where the Union's action was the "but-for" cause of Belanger's predicament. We do not now have to resolve the proper remedy for a situation where a union, purporting to represent one of its members in a dispute with an employer, so ineffectively represents the member before an arbitration panel in a case where the employer's position is contrary to the member's and consequently adversely affects him.

Where there has been a fair hearing before duly appointed arbitrators who have by whatever means heard both sides of the controversy and have before them all the relevant information upon which to base a decision, we will not overturn the award.[5]

In *Humphrey* v. *Moore,* 375 U. S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the Court refused to overturn the decision of a joint committee whose decision, according to the contract, was to be final and binding, and in doing so, the Court rejected the employees' contention that even if the union had acted in good faith and was entitled to take the position it had, the employees were deprived of a fair hearing due to inadequate representation of their position. The Court noted that the employees had notice of the hearing, that they never requested a continuance, and that there was no evidence that they could have added anything to the hearing by

---

[5]For a good analysis of the ramifications of finding a breach of the duty of fair representation where the employee's dispute has been arbitrated, see Clark, *The Duty of Fair Representation: A Theoretical Structure,* 51 Tex. L. Rev. 1119, 1167 et seq. (1973).

way of facts or theory.[5] *Id.* at 350-51, 84 S.Ct. 372; 11 L.Ed.2d 382. It was therefore, " 'idle speculation 'to assume that the result would have been different had the matter been differently presented.' " *Id.*

The facts in this case mandate a similar conclusion. Belanger was thoroughly conversant with the grievance procedures. Sometime prior to his confrontation with Matteson, he had filed a grievance with the Union against an appointment to the position of Head of the Business Department at another Warwick high school. Belanger subsequently withdrew the grievance. Furthermore, Belanger had been notified of the hearing on Matteson's grievance 10 days before it occurred. The School Committee's representative at the hearing before the arbitrators was Mr. Venditto, the Assistant Superintendent in Charge of Personnel, a gentleman who is no neophyte when it comes to this type of proceeding. It is uncontradicted that prior to the hearing he had summoned Belanger to his office where he and Belanger reviewed the testimony that Belanger would present to show his entitlement to fill the vacancy. At the hearing, Belanger and three other witnesses testified as to his qualifications for the position. He was present during the entire presentation of evidence and in the Superior Court he conceded that there was nothing further which he sought to offer at the hearing which was relevant to his qualifications. Belanger also agreed that at no time did he ever ask that the hearing be postponed or continued so that he could avail himself of the services of an attorney. Matteson appeared and testified at the hearing. Two other witnesses appeared on his behalf. The Union's executive secretary presented Matteson's grievance. The secretary is not an attorney. It is obvious from the record before us that

---

[6]We express no opinion as to whether we would agree with the Court that but for the listed factors, there would have been a violation.

the arbitrators had been presented a thorough and detailed listing of the qualifications and background of each candidate. We perceive no impropriety in the hearing conducted by the arbitrators which would justify the vacating of their award on the basis of the fair representation doctrine.

We would also emphasize that the manner in which this litigation arose differs markedly from that in *Vaca v. Sipes, supra,* and the majority of cases which have found a breach of the duty of fair representation. *See, e.g., Margetta v. Pam Pam Corp.,* 501 F.2d 179 (9th Cir. 1974); *Steinman v. Spector Freight Systems, Inc., Local 449,* 441 F.2d 599 (2d Cir. 1971). In all of these cases the litigation was essentially an employee's suit against the employer for breach of the collective bargaining agreement. The threshold question to be resolved in each of those cases was whether the employee had exhausted his remedies under the contract to permit him to sue in court. The employee, if he hadn't exhausted his contract remedies, or, in so doing had obtained a final, binding decision, had to overcome this impediment to his private suit. *Vaca* recognized that where the contract remedies are controlled by the union and not the employee, it would be unfair to deprive the employee of a remedy against a wrongful employer where his union had failed to properly and adequately make use of the contract procedures. *Vaca v. Sipes,* 386 U. S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842, 855 (1967). To allow a union's intentional or arbitrary failure to defend the employee's rights to bar his one chance to pursue them on his own was termed by the Court "patently unfair." The underlying wrongful conduct by the employer should not be immune from correction due to the wrongful conduct of the union.

But those situations are markedly different from the present one. Here we can conceive of no action which

Belanger might maintain against his employer. Indeed, initially, Belanger had attempted to have the School Committee enter this litigation on his side as a joint plaintiff. The only breach was by the Union; the arbitrators had Belanger's position aggressively argued and thus, unlike a *Vaca* situation, the Union breach did not foreclose a fair utilization of the contractual remedy; and the employer, who had done no wrong, should not be subjected to a relitigation of the question of who should be the head of the Business Department at Warwick Veterans High School. In *Vaca*, the Court expressly relied on an underlying employer breach to justify its forcing the employer to defend its actions beyond the contractually agreed forums. *Id.* at 196, 87 S.Ct. at 920, 17 L.Ed.2d at 861. In *Humphrey*, the Court also felt constrained to suggest that if the employer knew of the alleged union breach, and there was in fact a breach, it might overturn the arbitrators' decision.

Here, it would be unfair to subject the School Committee to a relitigation of the promotional dispute. If we were to hold otherwise, no employer would be safe in expending time and money in arbitration unless it first assured itself that the Union had not defaulted in its obligation to the employees it represented. This independent investigation into internal union procedures and decision making would be an affront to the union, and a burden on the employer.

It follows from what we have said that the trial justice erred when he vacated the arbitrators' award because of the Union's breach of its duty to represent fairly the interests of all its membership including that of Belanger.

We come now to the trial justice's vacating the arbitrators' award on the ground that they had exceeded their powers.

Within recent years we observed that the General As-

sembly, when it authorized the teachers to organize and bargain collectively with the respective committees, intended to confer on the teachers many of the well-recognized rights enjoyed by those who work in the private sectors of the economy including the right to have binding arbitration of grievances. *Providence Teachers Union, Local 958* v. *School Committee*, 108 R. I. 444, 448, 276 A.2d 762, 765 (1971). In taking this position, we ruled that the provisions of the School Teachers' Arbitration Act should be considered in conjunction with other relevant labor legislation, to wit, G. L. 1956 (1968 Reenactment) ch. 9 of tit. 28, which sets up a legislative framework for the arbitration of labor controversies, and consequently we recognized the validity of a clause calling for binding arbitration of grievances. The particular grievance in the *Providence Teachers Union* case related to a provision calling for the payment of severance pay to those teachers who retired during the contract period. What was said about severance pay can certainly be said about grievances concerning promotions.

Section 28-9-18 limits the jurisdiction of the Superior Court to vacate an award on proof of any one of these three specific grounds: (1) "fraud" in the procuring of the award, (2) the arbitrators have exceeded their powers or have so imperfectly executed them that no "mutual, final and definite award" was made, or (3) no valid submission or contract to arbitrate. The trial justice in ruling that the arbitrators had exceeded their powers relied first on G. L. 1956 (1969 Reenactment) §16-2-18 which states that the "selection of teachers" as well as the "entire care, control, and management of all the public school interests * * * shall be vested in the school committee" and secondly on his finding that the arbitrators had gone beyond the powers because of a purported shifting of the burden of proof by the board at the hearing.

Belanger cites §16-2-18 and then states that the court in *Dawson* v. *Clark*, 93 R. I. 457, 176 A.2d 732 (1962), observed that a school committee could not delegate the jurisdiction conferred on it by the Legislature. He also consistently refers to the filling of the business department vacancy as a "hiring." We acknowledge the presence of the statute and the holding in *Dawson*, but Belanger fails to give its entire holding.

To be precise, the *Dawson* case states that the committee's jurisdiction could not be delegated *in absence of legislative* authority to do so. *Id.* at 461, 176 A.2d at 735. However, assuming the absence of such authority, whoever succeeded to the post of department head is not being *hired*, he is being *promoted*. We think it elemental that the promotional provisions in the collective bargaining agreement envision the advancement of one who has already been hired and a member of the Warwick school system before the vacancy occurred. In such circumstances, you must have a hiring before you have a promotion. While we disagree with most of Belanger's contentions, we agree with his position that the selection process alluded to in §16-2-18 refers to an original hiring. The statutory grant relating to teacher selection does not, in our opinion, encompass within its language, the promotion of one whose performance warrants a "well done" and an advancement within the system.

When in 1975 we look at §16-2-18's language describing the committee's control and management of the school system, we must keep in mind that this statute was passed shortly after the turn of the century (1903) in a day when teachers were more prone to be disciples of John Dewey than supporters of Samuel Gompers. In reading §16-2-18, one must not forget that some 70 years later the General Assembly in enacting the School Teachers' Arbitration Act ordered the school committees of this

state to go and sit down at the bargaining table with the representatives of their teachers' union and then negotiate in "good faith" on such matters as hours, salary, working conditions, and "all other terms and conditions of employment." We have no doubt that the Legislature intended that classroom teachers should have the same opportunity of upward mobility as other workers who, because of the promotional provisions of their labor contract, remain on the job and hope that some day because of their superior performance they will move up the employment ladder and assume another and a better-paying position. An undue fixation with the language of §16-2-18 and a failure to broaden one's viewpoint so as to see what the General Assembly did, once the midpoint of this century had been reached, could result in the emasculation of the School Teachers' Arbitration Act. The legislative mandate for good-faith bargaining is broad and unqualified and we will not limit its thrust in the absence of an explicit statutory provision which specifically bars a school committee from making an agreement as to a particular term or condition of employment. *Board of Educ.* v. *Associated Teachers,* 30 N.Y.2d 122, 129-30, 282 N.E.2d 109, 113, 331 N.Y.S.2d 17, 23 (1972). When §16-2-18 and the School Teachers' Arbitration Act are placed in their respective time frames, it is obvious that the tightfisted grip which a school committee in 1903 might have held over the day-to-day operations of its schools has been relaxed somewhat when, at its January 1966 session, the Legislature directed such committees to act as responsible public employers; otherwise the goal of affording the advantage of collective bargaining procedures to this particular group of public employees could never be realized. It follows that the Warwick School Committee was well within its power when it agreed that its promotions of teachers could be subject to review by

the arbitrators through the use of the grievance mechanism set forth in the agreement. The arbitrators could therefore properly find a violation of the equal-ability proviso and direct that Matteson be appointed forthwith to the post at the high school.

In considering the trial justice's finding as to the improper shifting of the burden of proof, we will briefly set forth the approach taken by the arbitrators in resolving the controversy. The posted notice informed prospective candidates seeking to be head of the business department that in addition to having the "personal qualifications determined by the administration to be necessary for appointment," they must also possess a "thorough knowledge" of the subjects within the department's area of responsibility which knowledge had been gained by "classroom experience," an "ability to lead teachers and students" to a point where there would be a "high degree of cooperative action and good morale," and finally, an "exceptional ability to plan, develop and evaluate the curriculum * * *." In commenting on the terms of the contract the arbitrators observed that the Union and the School Committee, by their conduct and language in the agreement[7] permitting the grieving of promotions, had contemplated a "reasonable judgment" by the school officials of the candidates' qualifications and a "meaningful review" by the arbitrators of any contested advancement. They then stated that initially it was Matteson's obligation to show that he satisfied the requirements set forth in the notice and that he was senior to Belanger

---

[7]Article III, sec. 1(a) of the contract defines a grievance as a complaint by an employee that "(1) he has been treated unfairly or inequitably, (2) there has been a violation, misinterpretation or misapplication of the provisions of this contract, (3) that his health, safety or liability is jeopardized." In providing for binding arbitration. Art. III, sec. 2(c) specifically empowers the arbitrators to make "appropriate compensatory awards."

and that once this was accomplished, the School Committee could bring forth the factors which led it to believe that the junior man was superior. The arbitrators, after construing the agreement's reference to instances where equally qualified candidates are under consideration as meaning there was "little to choose between the two," ruled that the reasonableness standard to which we have already alluded required that there be a "material superiority" in the qualifications exhibited by the successful applicant. The arbitrators also remarked that, in showing this degree of superiority, the School Committee could not rely solely on its subjective opinion as to Belanger's attributes but had to point to a factual evidentiary basis which would support such a conclusion. Finally, the arbitrators went on to evaluate the evidence in the light of the guidelines they had established and, as is obvious at this point, they found both individuals equally qualified and Matteson, as the senior candidate, entitled to the position.

The trial justice, in his concern for the procedural pattern laid out by the arbitrators and the shifting burdens of proof and persuasion they adopted, has apparently overlooked the fact that an arbitration award is the decision of an extrajudicial tribunal which the parties themselves have created and by whose judgment they have mutually agreed to abide. While we have some doubt as to whether the arbitrators in their thoughtful analysis of the Warwick contract and how they would resolve the problem presented to them did in fact shift the burden of proof, the fact that the arbitration panel may fail to follow the strict legal rules of procedure and evidence is no ground for striking down their award. *Chillum-Adelphi Volunteer Fire Dep't, Inc.* v. *Button & Goode, Inc.*, 242 Md. 509, 518, 219 A.2d 801, 807 (1966). A judicial reversal of an arbitration award based solely on the review-

ing court's disagreement with the arbitrators' interpretation of the contract would not only nullify the bargain made by the parties but also threaten the strong public policy that favors private settlement of grievance disputes arising from collective bargaining agreements. *Goodyear Tire & Rubber Co.* v. *Local Union 200, United Rubber, Cork, Linoleum & Plastic Workers of America,* 42 Ohio St.2d 516, 330 N.E.2d 703 (1975). Except for complete irrationality, arbitrators are free to fashion applicable rules and determine the facts of a dispute before them without their award being subject to judicial revision. *Lentine* v. *Fundaro,* 29 N.Y.2d 382, 385, 278 N.E.2d 633, 635, 328 N.Y.S.2d 418, 422 (1972). As noted earlier, the General Assembly in enacting legislation authorizing the arbitration of disputes involving provisions contained in a collective bargaining agreement restricted the Superior Court's power to vacate an arbitration award to three grounds. A mistake of law is not one of the grounds. Such an omission is clear evidence that an award cannot be challenged on such a ground. *Loretta Realty Corp.* v. *Massachusetts Bonding & Ins. Co.,* 83 R. I. 221, 226, 114 A.2d 846, 849 (1955). We see no reason for faulting the arbitrators for the manner in which they decided to evaluate the evidence presented to them. There has been no excessive use of the arbitrators' power as they determined whether Belanger or Matteson should have been promoted.

The defendant's appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court.

Mr. Justice Paolino, concurring in part, dissenting in part. I agree with that part of the court's opinion finding that the Union breached its duty to fairly represent the interests of Mr. Belanger, but for the reasons that follow I respectfully dissent from the remainder of the court's opinion.

The majority rejects the argument that G. L. 1956 (1969 Reenactment) §16-2-18[1] irrevocably commits to the school committees of the several towns the power to assume the "entire care, control, and management of all the public school interests" including the selection of school teachers. They reach this result on the ground that a more recent statute dealing with a related subject matter, to wit, G. L. 1956 (1968 Reenactment) ch. 9.3 of tit. 28, the School Teachers' Arbitration Act, takes precedence over the older §16-2-18. This precedence, they say, derives from the relative ages of the two statutes, the changes of conditions that the passage of time inevitably works and the general caveat that an "undue fixation" with §16-2-18 would undermine and ultimately eventuate the demise of binding arbitration for teachers. The court therefore is content to interpret the teachers' power to enter into binding arbitration regarding the "terms and conditions of professional employment," (§28-9.3-2) so broadly as to include the power to submit to arbitrators questions of school teacher selection and promotion.

It is indeed settled law in this jurisdiction that a statutory provision which is last in order of time will be preferred over an earlier provision if the two provisions are irreconcilably repugnant. *Surber* v. *Pearce*, 97 R. I. 40, 44, 195 A.2d 541, 543 (1963). The majority has offered no proof of such a degree of repugnance between the two statutes here in question and in the absence of a clear mandate from either the Legislature or this court regard-

---

[1]General Laws 1956 (1969 Reenactment) §16-2-18 reads as follows:

"Selection of teachers and superintendent—General control of schools—Expenses.—The selection of teachers and election of superintendent, in such towns as do not unite for the employment of a superintendent, and the entire care, control, and management of all the public school interests of the several towns, shall be vested in the school committee of the several towns, and they shall also draw all orders for the payment of their expenses."

ing the exact status of teacher selection as a term or condition of employment, I believe it is unwise to create a conflict of such dimension that whole statutes are lost in the backwash. In reading statutes such as this, the court must remain mindful of the principle established in *Providence Teachers Union, Local 958* v. *School Comm.*, 108 R. I. 444, 276 A.2d 762 (1971), a case which coincidentally made the teachers' right to arbitrate coextensive with the rights enjoyed by employees in the private sector. In that case, this court stated:

> "Statutes which are not inconsistent with one another and which relate to the same subject matter are in *pari materia* and should be considered together so that they will harmonize with each other and be consistent with their general object and scope, even though they contain no reference to one another and were passed at different times." *Id.* at 449, 276 A.2d at 765.

Why should this principle not apply to an analysis of the arbitrators' award that is the subject of this appeal in light of §16-2-18? That is, the older statute, dealing with the same general subject matter as relevant portions of the School Teachers' Arbitration Act, does not, on its face, conflict therewith and therefore both statutes should be read in harmonizing fashion. A search of cases and statutory law has failed to reveal any indication that the appointment of teachers (or department heads) was, by the passage of the School Teachers' Arbitration Act, snatched from the purview of §16-2-18 and made the subject of arbitration and award. In view of the clear mandate of §16-2-18 and this court's holding in *Dawson* v. *Clark*, 93 R. I. 457, 176 A.2d 732 (1962) that the school committee's jurisdiction under that section could not be delegated in the absence of legislative authority to do so, *id.* at 460-61, 176 A.2d at 734,35, I believe that the school committee is not free to delegate its unique jurisdiction

over the selection of teachers. To conclude this point, it seems entirely inappropriate to preempt an entire section of the General Laws on the rather meaningless ground that a more modern statute governing related areas has been enacted by the Legislature. Chapter 9.3 of tit. 28 neither expressly nor impliedly abrogates the power conferred upon the school committee by §16-2-18 to appoint teachers. This court is not in the business of repealing statutes. On the contrary, it is our duty to apply statutes according to their original intendment wherever such application is in reasonable conformity with other related statutes.

Keeping in mind the basic notion that it is incumbent upon this court to harmonize statutes wherever possible, I turn now to what I believe to be a proper analysis of the problem presented to us here. The issue in this case could be framed as follows: Is a grievance *arbitrable* when exclusive control over the matter at issue has been statutorily granted to the local school committee? If this quaere is answered in the negative, then any award based on a submission to arbitration of such issues is a nullity. *School Comm.* v. *Curry*, 325 N.E.2d 282, 287 (Mass. App. 1975).

Courts are virtually unanimous in holding that at least some categories of disputes are nonarbitrable by virtue of the fact that a submission of such disputes would constitute a usurpation of the exclusive statutory jurisdiction of the school committees. Comment, *Defining the Scope of Grievance Arbitration in Public Education Employment Contracts*, 41 U. Chi. L. Rev. 814, 816-17 (1974) [hereinafter cited as Comment]. That is, some disputes, being formally designated as matters of management and educational policy, do not properly fall within the ambit of the School Teachers' Arbitration Act as "terms and conditions of professional employment." Section 28-9.3-2.

Essentially, therefore, the court's task is "* * * to accommodate contractual provisions for grievance arbitration to statutes vesting management and control of educational matters in local school boards." Comment, *supra* at 817.

Recent decisions of appellate courts in Massachusetts, *School Comm.* v. *Curry, supra,* and New Jersey, *Dunellen Bd. of Educ.* v. *Dunellen Educ. Ass'n,* 64 N. J. 17, 311 A. 2d 737 (1973), together provide an excellent template for decision in the case before us. The *Curry* case involved an appeal from a lower court vacation of an arbitration award which had reinstated a supervisor to a position which had been unilaterally abolished by the school committee. The Appeals Court affirmed, holding that the abolition of the position was "a matter of educational policy within the exclusive managerial prerogative of the school committee." *School Comm.* v. *Curry, supra* at 286-87. In the *Dunellen* case, the Supreme Court of New Jersey held that a school committee decision to consolidate department chairmanships was not reviewable by an arbitration panel in that such a consolidation was "not a proper subject of either arbitration or mandatory negotiation" under New Jersey law. *Dunellen Bd. of Educ.* v. *Dunellen Educ. Ass'n, supra* at 31, 311 A.2d at 744. Each of these courts acknowledged that its goal was to reconcile new labor rights with earlier enactments conferring specified powers on school committees; referred to in the parlance of the laborite as management rights. *School Comm.* v. *Curry, supra* at 284-86, *Dunellen Bd. of Educ.* v. *Dunellen Educ. Ass'n, supra* at 25, 311 A.2d at 741. The underlying presumption of each opinion was that the respective Legislatures of the two states could not have intended, by the passage of arbitration and collective bargaining acts, that local school committees could "abdicate their management responsibilities" to orchestrate general educational policy. *School Comm.* v. *Curry,*

*supra* at 286. The other side of this argument was forcefully presented by the New Jersey court in stating that the Legislature did contemplate a "statutory responsibility" to negotiate in good faith with employees regarding "* * * matters which intimately and directly affect the work and welfare of their employees." *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n, supra* at 25, 311 A.2d at 741. Clearly, these "matters" are those which are referred to in the arbitration acts as the "terms and conditions of employment" and are to be distinguished from those matters which relate primarily to educational policy. Disputes as to the former are negotiable and arbitrable while disputes as to the latter are neither negotiable nor arbitrable. As the *Dunellen* court noted, the distinction between the two areas of concern is often "shadowy" and the lack of legislative guidance on the matter prevents dispositive rulings by the courts. *Id.* at 25-26, 311 A.2d at 741. The picture is further distorted by the conflicting positions of the teachers, on the one hand, who argue for an expansive reading of "terms and conditions of employment" and the school committees, on the other hand, who prefer a narrower reading of the term in order to preserve management prerogatives. *Id.*, quoting *School Dist. of Seward Educ. Ass'n v. School Dist.*, 188 Neb. 772, 784, 199 N.W.2d 752, 759 (1972). The Massachusetts court astutely noted that the two areas are not mutually exclusive, that "conditions of employment" and "educational policy" do not denote two definite or distinct areas. Rather, that court stated that " '[m]any educational policy decisions make an impact on a teacher's conditions of employment and the converse is equally true.' " *School Comm. v. Curry, supra* at 286, quoting *West Hartford Educ. Ass'n, Inc. v. DeCourcy*, 162 Conn. 566, 581, 295 A.2d 526, 534 (1972). It is incumbent upon the courts therefore to render an interpretation of both terms when-

ever a matter is presented which does not clearly belong in one class or the other. This chore is best executed on a case-by-case basis in view of the dearth of available guidelines for decision. *Dunellen Bd. of Educ.* v. *Dunellen Educ. Ass'n, supra* at 27, 311 A.2d at 742, citing *West Hartford Educ. Ass'n, Inc.* v. *DeCourcy, supra* at 581, 295 A.2d at 534.

The ultimate outcome of such a categorization, as I stated earlier, is a determination as to whether the matter in issue is arbitrable. An award based on the submission of a dispute regarding educational policy is therefore a nullity whereas a dispute which truly involves "conditions of employment" is entirely arbitrable and the parties are entitled to a judgment on an award arising from such a dispute.

I turn now to a consideration of the specific issue in this case. In my view of the facts before us, we must decide whether the promotion of a school teacher to the position of department head by a school committee which has made an informed judgment as to that teacher's personal qualifications concerns the conditions of employment for teachers in the school district and thus is properly reviewable by an arbitration panel. I believe that it is not reviewable and my position finds support in the case of *Board of Educ.* v. *Rockford Educ. Ass'n,* 3 Ill. App. 3d 1090, 280 N.E.2d 286 (1972). The facts are similar to the case at bar. In 1969, the Board of Education for the City of Rockford, Illinois, created the promotional position of Director of Personnel and Recruitment and invited applications for said position from instructional staff members by posting an "Announcement of Vacancy." One particular guidance counselor along with several other of his colleagues informed the board of his interest in the position and made application therefor. The guidance counselor was recommended for the

post by the superintendent of schools but later in the year the board rejected all applications and declined to fill the vacancy. In October 1969, the counselor initiated grievance proceedings alleging, among other things, that the board had improperly failed to promote him to the position of Director of Personnel and Recruitment. After meeting with no success at the initial stages of the procedure the issue was submitted by the counselor and the association to arbitration. The board specially appeared before the arbitrator to argue that the "* * * matter of selection or employment of employees was not intended to be included in the Professional Agreement and could not, in any event, be delegated by the Board and, therefore, it was not an arbitrable issue." *Id.* at 1092, 280 N.E. 2d at 287. This question was considered by the arbitrator who concluded that the issue was arbitrable and set it down for hearing. The trial court considered the matter and set aside the arbitrator's award regarding the question of arbitrability and held that those portions of the agreement relating to arbitration of "matters of selection or promotion of employees" were null and void. *Id.* The appellate court affirmed this ruling stating that

> "* * * a board may not, through a collective bargaining agreement or otherwise, delegate to another party those matters of *discretion* that are vested in the board by statute." *Id.* at 1093, 280 N.E.2d at 287 (Emphasis added.)

Illinois has a statute which provides that the board has the duty "[t]o appoint all teachers and fix the amount of their salaries." Ill. Rev. Stat. ch. 122, §§10-20 and 10-20.7 (Smith-Hurd Supp. 1975). Under this provision the court was compelled to hold that although the agreement prescribed a promotional policy and procedure, such appointments were to be made on the basis of individual qualifications. "The ultimate determination of 'qualification,' " the court held, "was not, nor could it be, delegated

by the Board to any outside agency including the American Arbitration Association." *Board of Educ.* v. *Rockford Educ. Ass'n, supra* at 1094, 280 N.E.2d at 288. The issue was not arbitrable.

The present case lends itself to a similar line of reasoning. The plaintiff Belanger was recommended and appointed Chairman of the Business Department at Warwick Veterans Memorial High School. Subsequently, as a result of arbitration[2] which culminated a grievance procedure initiated by defendant Matteson and the Warwick Teachers' Union, Belanger was replaced by Matteson in accordance with the terms of the arbitrators' award. In my view of these facts, it is important to note at this point that after an initial determination by an evaluating committee appointed by the Superintendent of Schools that Belanger was most fit among the applicants to assume the disputed position, that determination was affirmed at each step of a four-step grievance procedure. That is to say, the employee's immediate supervisor, the Assistant Superintendent in Charge of Personnel, the Superintendent of Schools and the school committee all concurred in the decision that Belanger should fill the post. Belanger, pursuant to the terms of the announcement, was found to have the *"personal qualifications* determined by the administration to be necessary for appointment." This satisfied art. V, sec. 4(b) of the agreement which reads:

"Article V
Promotional Policy
"Section 4. Application
\* \* \*

"(b) Candidates shall be recommended on the

---

[2]It is important to note that plaintiff Belanger was not himself a party to the arbitration. The arbitrators' award was the product of a submission by the teachers' union (representing defendant Matteson) and the school committee.

basis of qualifications for the position. Where qualifications are considered equal, seniority in the Warwick School System shall prevail."

Because Belanger was considered to have superior qualifications, the fall-back criterion of Matteson's seniority in the system was never reached by the administration. The arbitrators, however, in the opinion written by the chief arbitrator, embarked upon a reevaluation of the administration's findings. They created their own standards of superiority, applied them to plaintiff's case and reached their own de novo conclusion that the qualifications of the two candidates were "roughly equal." Having reached this point they simply applied the seniority criterion and in their award held that "Matteson is entitled to the appointment forthwith."

In these circumstances it is my opinion that the school committee, by permitting the submission of this matter to arbitration, unlawfully delegated the discretionary authority that has been entrusted to it by statute.

> "The doctrine of the illegal delegation of power * * * is a constitutional doctrine which sometimes forbids government from sharing its powers with others. The doctrine of illegal delegation commands that certain discretionary decisions be made solely on the basis of the judgment of a designated official." Wellington & Winter, *The Limits of Collective Bargaining in Public Employment*, 78 Yale L. J. 1107, 1109 (1969).

In the present case, the commitment of discretionary judgment to the school committee on matters of hiring and promotion derives from several sources. The most important, of course, is §16-2-18, discussed above, which provides that "[t]he selection of teachers * * * shall be vested in the school committee." Similarly art. XVI of the agreement is the parties' own acknowledgment that "the School Committee possesses the sole right to * * * [h]ire, assign or transfer teachers." Finally, art. V, sec.

4(b) of the agreement entrusts to the administration the power to exercise its discretion in forwarding recommendations for promotion. While these two items from the agreement have no legal effect other than directly on the parties, they indicate the parties' acknowledgment and acceptance of the nondelegable nature of the school committee's discretionary authority.

To conclude and to relate this to the earlier discussion, the fundamental question here is whether the decision to promote Belanger was a matter of educational policy (committed to school committee discretion) or a matter affecting the terms and conditions of employment (fully arbitrable). In view of the extreme importance of personal qualifications as a condition for advancement and the fact that the school committee made a studied evaluation of the same, it appears to me that the arbitrators were permitted to venture beyond the proper scope of their authority in substantively reviewing the committee's decision. Where an appointment or promotion is to be based on qualification, the final determination of that criterion is not delegable by the school committee to any outside agency, including arbitrators. *Board of Educ.* v. *Rockford Educ. Ass'n, supra* at 1093-94, 280 N.E.2d at 288.

In view of the foregoing, I would conclude that the matter was not arbitrable and that the arbitrators' award, ordering the installation of defendant as department head, was a nullity.

I find the majority's opinion to be disturbing in yet another respect. That is, even if the issue submitted to the arbitrators was in fact arbitrable, I believe that the arbitrators in reaching their decision exceeded their powers

to a degree sufficient to render their award unenforceable. General Laws 1956 (1968 Reenactment) §28-9-18(b).[3]

To determine if an arbitrator exceeded his powers it is, of course, necessary to establish what his powers are. The classic exposition of this point was offered by Mr. Justice Douglas writing for the Court in *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U. S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960):

> "* * * [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Id.* at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428.

The arbitrator therefore is confined to interpreting the agreement so as to fulfill the intentions of the parties. His power is created by the parties when the agreement of submission is entered into and the parties are free to limit those powers by agreement. *Norwich Roman Catholic Diocesan Corp. v. Southern New England Contracting Co.*, 164 Conn. 472, 476-77, 325 A.2d 274, 276 (1973). It is incumbent upon the court in these matters to measure the award against the grant of power. One yardstick that has been suggested as an aid to such measurement is the assumption that

> "* * * absent an express provision in the contract to the contrary, the parties intended that the arbitrator should not be enabled to make an irresponsible

---

[3]General Laws 1956 (1968 Reenactment) §28-9-18, reads in part, as follows:

"Grounds for vacating award.—In any of the following cases, the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated.

* * *

"(b) Where the arbitrator or arbitrators exceeded their powers * * *."

award at variance with any possible construction of the contract * * *. This being assumed, the question for the court is whether the construction of the contract made by the arbitrator is a reasonably possible one that can seriously be made in the context in which the contract was made. Stated affirmatively, if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of the contract, then the court would be bound to vacate or refuse to confirm the award." Pirsig, *Some Comments on Arbitration Legislation & the Uniform Act,* 10 Vand. L. Rev. 685, 706 (1957), cited in *University of Alaska* v. *Modern Constr., Inc.,* 522 P.2d 1132, 1137 n.12 (Alas. 1974).

It is conceded that judicial review of arbitrators' decisions is limited, yet the proper judicial remedy where an arbitrator exceeds his power by giving "perverse misconstruction" to the collective bargaining agreement, is vacation of his award. *W. M. Girvan, Inc.* v. *Robilotto,* 40 App. Div.2d 1060, 1061, 338 N.Y.S.2d 950, 953 (1972); General Laws 1956 (1968 Reenactment) §28-9-18. *See generally Board of Educ.* v. *Champaign Educ. Ass'n,* 15 Ill. App.3d 335, 340, 304 N.E.2d 138, 141-42 (1973).

Applying these principles to the case at bar, I conclude that the arbitrators exceeded their powers in reaching their conclusion that Matteson and not Belanger was entitled to the appointment. While the arbitrators were free to interpret the agreement as it applied to promotional policy, they were not free to render a reading that was clearly contrary to the plain meaning of the contract. *Livingston* v. *Tel-Ant Electronic Co.,* 4 Misc.2d 600, 605, 138 N.Y.S.2d 111, 117 (1955). The plain meaning of art. V, sec. 4(b) of the agreement is that the emphasis in promotional matters is to be the personal qualifications of the candidate. Seniority within the school system is clearly framed as a fall-back criterion in the event of equal

qualification between candidates. The arbitrators, however, in requiring that the school committee meet a renewed burden of proof that the plaintiff had superior qualifications and that the defendant show only that he was Belanger's senior, reversed the burdens of proof that the agreement anticipated. The arbitrators in this case should have required Matteson and the union to come forth with facts indicating that the committee's decision was unreasonable. Where an agreement prescribes an elaborate four-step grievance procedure it surely does not contemplate a de novo review by an arbitration panel whose expertise may as likely as not lie in some field totally unrelated to education. The arbitrators' function, especially in a situation where personal qualities are of utmost concern, is not to rehash the very basic considerations presented to the original evaluating committee for their seasoned judgment. Their function, as noted above, is simply to review the previous findings and the contract provisions in equal light and to determine whether the former contravene the parameters set out by the latter. In this case, the arbitrators overstepped their bounds and propounded findings that went to the basis of the decision rather than to its contractual appropriateness and its procedural correctness. It placed too onerous a burden on the school committee when the committee had already met its proper burden at every step of the promotion and grievance process.

I would find that this constituted a "perverse misconstruction" of the terms of the agreement and warrants the vacation of the award. The arbitrators plainly exceeded their powers. Consequently, §28-9-18(b) provides that the award must be vacated.

Petition for reargument denied.

*Letts, Quinn & Licht, Frank Licht, Richard A. Licht,* for plaintiff.

*Tillinghast, Collins & Graham, Frank J. Williams,* for Arthur B. Matteson.

*Richard A. Skolnik,* for Warwick Teachers' Union, for defendants.