OPINION
In this action for declaratory and injunctive relief, the Central Falls School District Board of Trustees and its Superintendent (the "District") move for summary judgment and ask this Court to declare that the grievance filed by the Central Falls Teachers' Union (the "Union") over the District's decision to promote Steven DeLeo over another candidate to the position of English Department Chair of Central Falls High School is not an arbitrable dispute. They also ask this Court to enjoin the pending arbitration.
The District's position is that, under its collective bargaining agreement with the Union (the "CBA"), it did not agree to submit disputes over its determination of a candidate's qualifications for promotion to arbitration, and even if it did, the weighing of qualifications for the English Department Chair is a non-delegable statutory duty vested in the District. The District also argues that intervention in Central Falls' failing school system by the State Commissioner of Education, requiring an increased leadership role for department chairpersons, eviscerates any contrary arbitration rights of the Union. *Page 2 
The Union opposes the District's motion for summary judgment and its requests for declaratory and injunctive relief, asserting that the CBA submits any dispute over the promotion of a person to English Department Chair to arbitration and that such a determination is a delegable duty. The Union also contends that when the Commissioner of Education intervenes in a failing school system, he or she does so subject to the rights contained in an existing collective bargaining agreement.
For the reasons set forth in this Decision, this Court grants the District's motion for summary judgment. This Court declares that the District's decision to promote DeLeo to the position of English Department Chair, based on a finding that he was the better qualified candidate, is committed to its sound discretion and managerial prerogatives under the CBA and state law, is non-delegable based on the statutory powers conferred upon it and the Commissioner and is thus non-arbitrable. As the Union never sought to grieve the District's qualification determination based on an argument that it reflected bad faith, this Court enjoins the pending arbitration.
I. Factual Background and Procedural History
The Rhode Island General Assembly created the Central Falls School District Board of Trustees to govern the Central Falls School District after it determined that the City of Central Falls no longer could fund its school system adequately. See R.I.G.L. § 16-2-34. The Board of Trustees, in addition to the powers conferred on it by § 16-2-34, possesses the same powers and duties as regular municipal school committees constituted under R.I.G.L. § 16-2-9. Id. The Board of Trustees appoints a Superintendent of Schools *Page 3 
who is responsible for the day-to-day operations of the School District.Id. §§ 16-2-34(h), 16-2-9.
The Board of Regents for Elementary and Secondary Education is a public corporation charged with oversight of the State's elementary and secondary education institutions. Id. §§ 16-60-1 et seq. It appoints a Commissioner of Elementary and Secondary Education who serves as the "chief executive officer of the board of regents and as the chief administrative officer of the department of elementary and secondary education." Id. § 16-60-6. The Board of Regents appoints members of the Board of Trustees, upon nomination by the Commissioner. Id.
§ 16-2-34(b).
In the case at bar, the Union and the Board of Trustees entered into a CBA, effective from September 1, 2005 through August 31, 2008. In June 2006, the position of English Department Chair at Central Falls High School became vacant. The District concedes that the English Department Chair is a "promotional position," as defined by the CBA. Complaint ¶ 11. The District posted the vacancy, seeking applicants for the position of English Department Chair with the following qualifications: 3 years of successful teaching experience in English; a Master's Degree in English or Secondary Administration; a valid Rhode Island teaching certificate in English at the secondary level; and a minimum of 3 years teaching experience in the Central Falls system. The posting identified the Principal of Central Falls High School as the immediate supervisor of the English Department Chair. It further stated that the English Department Chair would "[a]ct as agent between the Principal's office and all teachers of the Department" and "perform all duties required by the Principal." The posting also outlined additional administrative and educational duties of the English Department Chair. See n. 10,infra. *Page 4 
Both Steven DeLeo and Marie O'Neil applied for the position of English Department Chair. Although O'Neil had seniority over DeLeo, the Interim Superintendent for the School District, William R. Holland, determined that DeLeo was more qualified for the position. He explained that he "felt that Mr. Steve DeLeo's record of success in the leadership roles he has assumed at the High School made him better qualified for this position at this point in time." Based on the recommendation of Dr. Holland, the Board of Trustees appointed DeLeo as English Department Chair.
In accordance with the CBA, on September 11, 2006, the Central Falls Teachers Union filed a Level 1 Grievance on behalf of O'Neil, contending that the District violated Art. IV, Sec. 1, entitled "Promotions/Promotional Qualifications" and Art. IV, Sec. 2, entitled "Department Chairs," by not selecting O'Neil as English Department Chair.[1] On September 14, 2006, Central Falls High School Principal, John W. Kennedy, denied the Union's Level 1 Grievance. In denying the grievance, he stated:
 1. . . . the key point that should be considered is the administrative and leadership functions that are a part of the duties of department chair. These are described in the duties section of the posting and were addressed during the interview process.
 2. The thoroughness of the responses provided by the other candidate as to the qualities of leadership and involvement needed by the incoming individual were sufficient to weigh the selection for English Department Chair in his favor.
Thereafter, on September 18, 2006, the Union filed a Level 2 Grievance with Interim Superintendent Holland. On October 2, 2006, after a hearing the prior week, he denied the Level 2 Grievance. *Page 5 
On October 5, 2006, the Union then filed a Level 3 Grievance with Ms. Anna Cano-Morales, Chairperson of the Board of Trustees. On February 16, 2007, the Board of Trustees also denied the grievance. It advised the Union that it did not believe that the choice of English Department Chair is an arbitrable matter, but instead is a management prerogative.
On March 14, 2007, the Union filed a demand for arbitration pursuant to Art. III, Sec. 3 of the CBA. The Union seeks to arbitrate whether O'Neil possessed qualifications for promotion that were at least equal, if not superior, to DeLeo's qualifications such that the Interim Superintendent should have promoted her based on her seniority. The District informed the American Arbitration Association that the matter was not arbitrable and that it would seek to enjoin the arbitration. As the AAA does not involve itself in disputes over arbitrability, it proceeded to schedule the arbitration.
After the initial scheduling of arbitration, the District submitted a corrective action plan to the Board of Regents as part of its attempt to comply with the Commissioner's directives to remedy Central Falls High School's status as an underperforming school.[2] A key element of this plan was to ensure that the department chairpersons at Central Falls High School took on an increased leadership role in the instructional process to aid in the implementation of the corrective action plan. Commissioner of Education, Peter J. McWalters, endorsed the proposed changes to the role of department chairpersons. Commissioner McWalters stated that the change in the *Page 6 
responsibilities assigned to department chairpersons was significant enough that a reposting of the offices may be required to fill them with qualified persons. The Union responded to him on August 6, 2007, endorsing the substance of the revisions to the job description for department chairpersons, but opposing the re-posting of the positions.
On October 17, 2007, Dr. Frances Gallo, who had become the new Superintendent since the processing of the subject grievance, informed the Union that she had been authorized by the Board of Trustees to reconsider the grievance filed by O'Neil, as Dr. Gallo had not been involved in the original promotional decision. Dr. Gallo summarized that grievance as claiming that "Ms. Marie O'Neil was equally or better qualified than Mr. DeLeo, and more senior, and accordingly that she should have been given the position." She stated that, on review of the qualifications of O'Neil and DeLeo, it appeared that they were "relatively equal" and that it would be in the best interest of the District to re-interview them and any other candidates who might be interested in the position. As a result, she granted the grievance in part and denied it in part and declared the position of English Department Chair vacant. She continued DeLeo in that position in an acting capacity and indicated that she intended to re-interview candidates for the position, not as an admission that any procedures were not followed properly in the prior interview process, but to ensure that she had the most qualified individual for the job.
After a meeting between the Union and the Superintendent Gallo on October 24, 2007, O'Neil rejected the opportunity to re-interview with Dr. Gallo for the position of English Department Chair. She claimed that she already was entitled to the promotion under the CBA (which she intended to establish through arbitration) and that DeLeo would have an unfair advantage in a second interview because he already had held the *Page 7 
subject position. At their meeting, Dr. Gallo had offered to construct the interview questions carefully to allay O'Neil's fears that DeLeo's current professional development training would put her at a disadvantage. Dr. Gallo also had offered to have a Union representative present during the two interviews to monitor them for fairness and consistency. Based on O'Neil's decision not to re-interview with Dr. Gallo, however, Superintendent Gallo advised the Union that she would proceed to re-interview DeLeo. She invited the Union to attend that interview, but it declined. In response to this apparent deadlock, and the scheduled arbitration, the Board of Trustees and Superintendent Gallo filed the instant complaint.
In this action, the District seeks a declaratory judgment "that the grievance referenced herein is not arbitrable" and an injunction to prevent the scheduled arbitration.[3] The District has moved for summary judgment as to its claim for declaratory relief, which the Union opposes. This Court has jurisdiction of this action pursuant to the Uniform Declaratory Judgments Act, R.I.G.L. § 9-30-1, its general equity powers under R.I.G.L. § 8-2-13, and its authority to determine arbitrability and order or enjoin arbitration under R.I.G.L. § 10-3-5.
II.
The Parties' Arguments
A. The District *Page 8 
In support of its motion for summary judgment and its request for declaratory and injunctive relief, the District first contends that, under the CBA, it never agreed to arbitrate the Superintendent's discretionary determination of candidates' relative qualifications for promotion to English Department Chair. It contends that such power is a "reserved management right" that must be delegated specifically or otherwise is retained by the District. See Pawtucket School Comm. v.Pawtucket Teachers' Alliance, Local No. 930, 652 A.2d 970, 972 (R.I. 1995) (holding that school ESL Director's requirement that all teachers in the Limited English Proficiency Program submit lessons plans was not contrary to the contract's "change in work conditions" provision because ESL evaluation was not specifically mentioned in the CBA as a past practice). The District avers that it never specifically agreed to submit such disputes to arbitration, such that the CBA only requires that its decision on qualifications be made in good faith. The determination of this procedural guarantee is all that the CBA submits to arbitration.
The District next asserts that even if the CBA requires arbitration of this dispute, it is not binding because department chair qualification determinations are legally non-delegable statutory duties vested in the District by R.I. Gen. Laws §§ 16-2-9, [4] 16-2-11, [5] *Page 9 16-2-18, [6] and 16-2-34.[7] The District contends that the nearly identical case of Belanger *Page 10 v. Matteson, 115 R.I. 332, 346 A.2d 124 (1975) — which took a constrained view of the duties that are conferred on school committees by legislative grants of authority and also held that school committees may negotiate over terms and conditions of employment, absent an "explicit statutory provision which specifically bars a school committee from making an agreement as to a particular term or condition of employment" — has been implicitly overruled by subsequent case law. Now, the District asserts, a term or condition of employment is non-delegable if that delegation interferes with its broad, statutory duties, regardless of whether there is an express statutory prohibition against delegation. See Pawtucket School Committee, 652 A.2d 970, 972 (R.I. 1995) (stating that a CBA could not restrict a school committee's ability to oversee and require lesson plan submissions from ESL teachers because doing so would interfere with the school committee's statutory responsibilities under R.I.G.L. §§ 16-54-2 and 16-2-9 to "evaluate ESL programs and determine whether they conform with state law and the rules and regulations promulgated by the Board of Regents for Elementary and Secondary Education"); Vose v. R.I. Brotherhood of CorrectionalOfficers, 587 A.2d 913, 915 (R.I. 1991) (holding that the ACI director could not delegate the authority to compel correctional officers to work overtime because doing so would interfere with his broad *Page 11 
statutory duty under R.I.G.L. § 42-56-10 to "make and promulgate necessary rules and regulations incidental to the exercise of his or her powers [to provide for] * * * safety, discipline, * * * care, and custody for all persons committed to correctional facilities").
Finally, the District contends that even if the Superintendent's promotional decision is delegable, intervention by the Commissioner of Education in the School District pursuant to R.I.G.L. § 16-7.1-5 — a provision within §§ 16-7.1-1, et seq., "The Rhode Island Student Investment Initiative" — and his endorsement of a change in the leadership role of department chairpersons at Central Falls High School to assist the school in elevating itself from its underperforming status eviscerates any conflicting arbitration rights the Union may have had under the CBA. The District takes the position that the Commissioner requires more of a leadership role from department chairpersons and that DeLeo was chosen for English Department Chair because of his leadership abilities. According to the District, to allow an arbitrator to review and potentially alter the Superintendent's discretionary decision as to which candidate was the most qualified for promotion, would undermine the Commissioner's directive that the District use its judgment to appoint those individuals that it deems the best leaders to occupy departmental leadership positions.
B. The Union
In response, the Union contends that, although the CBA did not specifically delegate promotional qualification determinations to an arbitrator, this dispute is arbitrable because the CBA provides criteria for promotions, and the grievance section of the agreement requires arbitration for alleged violations of the CBA. The Union contends that under these circumstances — and even where there is doubt about an agreement to *Page 12 
arbitrate — state and federal case law require submission of the dispute to arbitration. See United Steelworkers of America v. Warrior GulfNavigation Co., 363 U.S. 574, 582-583 (1960) (holding that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute, and doubts should be resolved in favor of arbitration); School Comm. v.Pawtucket Teachers Alliance, AFT Local 930, 390 A.2d 386, 389 (R.I. 1978) ("A court shall rule in favor of submitting the dispute to arbitration unless the arbitration clause . . . cannot be interpreted to include the dispute").
The Union next argues that the decision to promote an individual to the position of English Department Chair is a delegable statutory duty under the dictates of the Rhode Island Supreme Court's decision inBelanger v. Matteson, 115 R.I. 332, 346 A.2d 124 (1975), cert.denied, 424 U.S. 968 (1976). The Union asserts that R.I. Gen Laws §§ 16-2-9, 16-2-11, 16-2-18, and 16-2-34 do not specifically entrust the District with the responsibility to promote teachers, and because no other statutes specifically prohibit the delegation of that duty, it is delegable. Moreover, the Union maintains that §§ 16-2-9, 16-2-11 and16-2-34 cannot be used to undermine a collective bargaining agreement because those statutory provisions each state that they cannot be construed to limit or interfere with a union's ability to bargain collectively or to allow a school committee to abrogate a collective bargaining agreement.[8] The Union contends that the only statute the District *Page 13 
can rely upon to upset a provision of such a contract is § 16-2-18, which does not prevent the delegation of promotional decisions for department chairpersons under Belanger.
Additionally, the Union argues that the Board of Trustees, being tantamount to a school committee under § 16-2-24, is directed by the Certified School Teachers' Arbitration Act, R.I.G.L. §§ 28-9.3-1 etseq., to negotiate the terms and conditions of employment in good faith. As such, a ruling that would allow the Board of Trustees to obviate their contracts would make these good faith mandates "devoid of any purpose," and contrary to legislative intent. Cocchini, et al v. City ofProvidence, 479 A.2d 108, 111 (1984) ("This court will not ascribe to the Legislature an intent to enact legislation that is devoid of any purpose, is inefficacious, or is nugatory").
The Union further responds that intervention by the Commissioner pursuant to § 16-7.1-5 does not undermine the CBA's delegation of promotional authority. It argues that this statute does not prohibit negotiating with teachers unions, and Belanger required such a prohibition to find non-delegability. The Union additionally argues that by intervening in the School District, the Commissioner is wresting management of the schools from the Board of Trustees and, therefore, the Commissioner is bound by the School District's existing contracts.See Exeter-West Greenwich Reg. School Dist. v. Exeter-West GreenwichTeacher's Ass'n, 489 A.2d 1010 (R.I. 1985) (holding that the Town Council was bound by, and had to fund, the School Committee's collective bargaining agreements).
All of these arguments, summarized above, were presented by the parties in their respective memoranda in support of and in opposition to plaintiffs' motion for summary judgment. After the parties presented these arguments, and while this Court had this *Page 14 
matter under advisement, the Rhode Island Supreme Court, on April 23, 2008, handed down a seminal decision concerning arbitration of employment disputes in the field of public education: North ProvidenceSchool Committee v. The North Providence Federation of Teachers,945 A.2d 339 (R.I. 2008). In that case, the Supreme Court held that an arbitrator did not act in manifest disregard of state law by finding that the School Committee's elimination of an English composition period for financial reasons was improper under the CBA, but suggested that if the same decision had been made by the School Committee for educational policy reasons, the issue probably would have been non-arbitrable.
Aware of the import of this decision, this Court began revisiting the parties' legal arguments in light of the new precedent. Perhaps concerned that this Court was not yet aware of the new Rhode Island Supreme Court decision, the District subsequently filed a motion to file a supplemental memorandum out of time, arguing that the Supreme Court's decision in North Providence School Committee is dispositive of the issue of arbitrability in this case. It relies on the language from that decision that, had the School Committee eliminated the English composition period for "the purpose of improving the education . . . of students in English," instead of economic reasons, then it is entirely possible, in fact the language suggests probable, that such a decision would be non-arbitrable. 945 A.2d at 347. By analogy, the District argues here that its determination of the relative qualifications of candidates for promotion to English Department Chair is non-arbitrable because it is intimately tied to improving education and cannot be bargained away.
The Union objected to the District's motion to file a supplemental memorandum out of time and argues that North Providence SchoolCommittee actually supports a *Page 15 
decision of arbitrability in this case. According to the Union, arbitration is necessary to determine whether the District's promotional decision is "directly related to the essence of the educational mission." Id. at 346. It contends that arbitration is required to determine the motive of the District in promoting DeLeo and whether that promotion was made for reasons unrelated to qualifications for the position (i.e., based on nepotism, discrimination or fiscal reasons) that would not implicate any non-delegable duty to determine educational policy. Even absent motivation, the Union argues that the matter is arbitrable because promotional issues involve workload and compensation and thus "directly affect the work and welfare of the members" — making the issue properly subject to arbitration under the CBA. Id.
This Court is duty bound to consider this intervening, and highly relevant, Rhode Island Supreme Court precedent in deciding this case. It can be assisted in that regard by the parties' supplemental memoranda. In the interest of justice, therefore, this Court will grant the District's motion to file a supplemental memorandum out of time. It will consider the parties' respective supplemental memoranda concerning the Supreme Court's decision in North Providence School Committee, in connection with their earlier filed memoranda and arguments, in deciding plaintiffs' motion for summary judgment and related requests for declaratory and injunctive relief.
III.
Analysis
A. The Collective Bargaining Agreement
The first issue that this Court must resolve is whether the CBA provides for arbitration of grievances concerning the relative qualifications of applicants for the *Page 16 
position of Department Chair. To answer this question, this Court must examine the pertinent language of the CBA.
The broad purposes of the CBA are set forth as follows:
 Preamble
 Whereas, the School Teachers' Arbitration Act accords public school teachers the right to organize, to be represented and to bargain on a collective basis with school committees and comparable school administrative agents regarding hours, salary, working conditions and other terms/conditions of employment;
 Whereas, the Central Falls School District and the Central Falls Teachers' Union desire to promote good relations among certified teachers and between the District and the Union in the best interests of high quality education in the Central Falls school system; to provide and maintain mutually satisfactory terms and conditions of employment; and to provide for the adjustment of grievances and disputes arising out of employment of certified teachers; and
 . . .
 Whereas, there is reserved exclusively to the Board all responsibilities, powers, rights and authority expressly or inherently vested in it by the laws and constitutions of Rhode Island and the United States, excepting where expressly and in specific terms limited by the provisions of this Agreement. It is agreed that the Board retains the right to establish and enforce reasonable rules and personnel policies relating to the duties and responsibilities of teachers and their working conditions which are not inconsistent with this Agreement.
 In all matters under this Agreement calling for the exercise of judgment or discretion on the part of the Board, the decision of the Board shall be final and binding if made in good faith, except where otherwise provided in this Agreement.
(Emphasis added). The relevant provisions of the CBA that concern promotions are outlined, as follows:
 Article VI — Promotion and Transfer Policy
 Section 1. Promotions/Promotional Qualifications
 Promotional positions are defined as follows: Positions in the administrative-supervisory level or positions involving a salary difference where the duties are distinctly different from those of the position of applicant; however, promotional positions for the purpose of this contract *Page 17 
shall not include the positions of superintendent, assistant superintendent (or any position normally associated with the Central Office), principals or assistant principals. . . .
 Promotional positions shall be filled on the basis of qualifications. Where qualifications are substantially equal, seniority shall prevail. Qualifications as used in this section shall be defined as those requirements established by the State Department of Education and those listed by the District in the posting of the notice
 . . . .
 Qualifications used here is [sic] defined as knowledge, skills and ability to perform the duties specified on the job posting.
 . . .
 Appointment to any promotional position shall be made solely on the basis of qualifications and in accordance with this contract, except that all other things being equal, preference will be given to qualified teachers already employed by the District.
 Any qualified applicant within the bargaining unit at the time of application not selected for such a post shall be given reasons thereof in writing upon request to the Superintendent . . . Any teacher not satisfied with the reasons given by the Superintendent may file a grievance.
 Section 2. Department Chairs . . .
 When a [listed high school department] chair is vacated . . . it will be adequately publicized by the Superintendent. . . .
 . . .
 The chair shall be selected from those teachers who hold a master's degree in the subject area and/or a Master of Arts in Teaching and/or secondary administration, provided the individual is certified to teach in that department and from those who have had at least three years teaching experience in the system.
 If no teacher holds a master's degree in the subject area and/or secondary administration, the District may select a teacher from within that department with at least three years experience in said department. The teacher shall have a period of three years from the date of appointment to obtain one of the prescribed master's degrees. Should no teacher with three years in the department apply, the District may select the chair from outside the department and/or school system.
 In no case will the District appoint a chair that has had less than three years teaching experience.
 . . .
The grievance procedure set forth in the CBA provides, in pertinent part, as follows: *Page 18 
 Article III — Grievance Procedure
 Section 1. Definition
 (1) A grievance is a claim by an employee that he or she has been treated unfairly, or it is a claim that there has been a violation, misinterpretation or misapplication of the provisions of this agreement, established policy or practice.
 . . .
 Section 3. Procedure
 D) Level Four: Arbitration
 (a) If the aggrieved is not satisfied with the disposition of this grievance at Level Three . . . [the aggrieved may] request in writing to the chairperson of the grievance committee to submit his/her grievance to arbitration.
 . . .
 (c) . . . The arbitrator will be without power or authority to make any decision which requires the commission of an act prohibited by law or which violates the terms of this agreement. . . .
 . . .
Reading these provisions together reveals that the CBA outlines criteria for promotions and seems to allow for grievance and arbitration whenever an employee is not satisfied with the reasons given for denial of promotion, believes that he or she has been treated unfairly, or thinks that there has been a violation, misinterpretation or misapplication of the CBA. Such language, when viewed in light of Rhode Island's policy of favoring arbitration, might suggest that all disputes arising out of promotional decisions are encompassed by the grievance and arbitration provisions of the CBA. See School Committee,390 A.2d at 389 ("A court shall rule in favor of submitting the dispute to arbitration unless the arbitration clause cannot be interpreted to include the dispute."); see also Narragansett School Committee v.NEA/Narragansett, 2005 R.I. Super. LEXIS 68 (R.I.Super. 2005) (Lanphear, J.) (holding that a dispute over the *Page 19 
decision by school committee to promote a candidate to position of assistant principal was arbitrable under collective bargaining agreement).
A closer reading of the CBA, however, suggests that not all aspects of a promotional decision are subject to grievance and arbitration. In a portion of the Preamble, for example, it states:
 In all matters under this Agreement calling for the exercise of judgment or discretion on the part of the Board[,] the decision of the Board shall be final and binding if made in good faith, except where otherwise provided in this Agreement.
The question thus becomes whether a decision by the Superintendent, and ratified by the Board, as to who is most qualified for a promotion — assuming all other requirements for that promotion under the CBA are satisfied — is a decision made through the exercise of judgment or discretion that is final and binding if made in good faith.
The CBA effectively sets a qualification floor by requiring certain minimum credentials for the position of English Department Chair, some of which vary depending upon the credentials of the candidates in the applicant pool. See CBA Art. VI, sec. 2.[9] If a candidate does not possess these listed objective qualifications and is nonetheless *Page 20 
promoted over someone who does possess those qualifications, the person denied promotion may be able to arbitrate the dispute.[10]
Beyond these prerequisites, any promotional position must be filled on the basis of those qualifications "established by the State Department of Education and those listed by the District in the posting of the notice." Id. Art. VI, sec. 1. Although the vacancy posting here lists broad "duties" associated with the position of English Department Chair[11] — in addition to listing the "qualifications" that track the objective, required credentials for the position discussed above — the ability to effectively carry out the listed duties must be considered a necessary qualification for the position. Indeed, the CBA itself defines qualification for this position as the "knowledge, skills and ability to perform the duties specified on the job posting." Id.
The determination of a candidate's ability to fulfill these duties, therefore, as contrasted with the objective "qualifications" listed in the job posting, cannot be measured adequately by objective, "on paper" criteria alone. This determination is more subjective and depends not only on an assessment of an applicant's education and experience, but also on intangible qualities that may display themselves most effectively in an interview. In measuring competing applicants' abilities to perform the job duties of English Department Chair, it is critical, therefore, that the Superintendent is not bound to apply some formulaic analysis. He or she instead must be free to determine who would *Page 21 
best fulfill the job duties, work most effectively with students, teachers, administrators and staff at the school, and advance the school's educational mission. The Superintendent must be free to choose the person best equipped to help the school shed itself of its underperforming school label, as mandated by the Commissioner of Education.
As such, any determination of who is best qualified to be promoted to the position of English Department Chair necessarily involves judgment and discretion on the part of the Superintendent. Under the CBA, therefore, that decision is final and binding — and not subject to arbitration — as long as it is made in good faith and the CBA does not provide otherwise.
The Union suggests that the CBA does provide otherwise and allows submission of this dispute to grievance and arbitration because it allows "any qualified applicant . . . not selected for such post [to] be given reasons thereof in writing upon request to the Superintendent" and that "[a]ny teacher not satisfied with [those] reasons . . . may file a grievance." Id. It argues further that the CBA defines a grievance as including "a claim by an employee that he or she has been treated unfairly" or "a claim that there has been a violation, misinterpretation or misapplication of the [CBA]." Id. Art. III, sec. 1.
Yet, none of those provisions of the CBA provide that a discretionary decision on the part of the Superintendent in assessing promotional qualifications, if made in good faith, is not to be final and binding. Absent such a provision in the CBA, per the language of the Preamble itself, discretionary decisions or judgment calls of the Superintendent in assessing promotional qualifications of candidates for department chair *Page 22 
positions, made in good faith, are final and binding and thus not subject to grievance or arbitration.
The provisions of the CBA relied on by the Union thus must be read in tandem with the portion of the Preamble of the CBA speaking about decisions made in the exercise of judgment or discretion, thereby limiting the scope of a grievance that can be arbitrated by an applicant not selected for promotion to department chairperson. While such an applicant may be dissatisfied with the Superintendent's reasons for not selecting him or her for promotion, believe that he or she has suffered unfair treatment, or believe that the appointment of a competing candidate constitutes a violation, misinterpretation or misapplication of the CBA, such a grievance can be arbitrated only if the applicant claims that the promotional decision of the Superintendent was made in bad faith. A claim by an applicant that the Superintendent erred in determining that she was not at least equally, if not more, qualified than the candidate chosen for promotion, with no allegation that the applicant who was selected lacked the objective qualifications for the position required by the CBA or that the Superintendent made the decision in bad faith, is not a dispute subject to grievance and arbitration under the CBA.
In this case, Interim Superintendent Holland promoted DeLeo over O'Neil because he believed that the candidate's "success in the leadership roles he has assumed at the High School made him better qualified for this position at this point in time." See Dr. Holland's Letter to Marie O'Neil dated August 28, 2006. This decision clearly reflects the exercise of judgment or discretion on the part of Dr. Holland as to who was more qualified for the position of English Department Chair. In seeking to grieve and arbitrate that decision, the Union has never claimed that Dr. Holland made that decision *Page 23 
in bad faith or contrary to the objective promotional criteria set forth in the CBA. The Union's claim is simply that O'Neil is at least equally, if not more, qualified for the promotion than DeLeo and that Dr. Holland erred in deciding otherwise. Consequently, the District's decision to promote DeLeo to the position of Department Chair is final, binding, and not arbitrable under the provision of the CBA that carves out discretionary promotional decisions from grievance and arbitration.[12]
Moreover, in addition to the language concerning decisions based on judgment or discretion, there is another provision of the Preamble of the CBA that suggests that the parties did not agree to allow this dispute to be grieved or arbitrated. That provision reserves to the District all "responsibilities, powers, rights and authority, expressly or inherently vested in it by the laws and constitutions of Rhode Island and of the United States," unless expressly delegated. The right to judge relative qualifications for promotion is not explicitly delegated in the CBA. The right to determine promotional qualifications is not "expressly" vested in the District under R.I. Gen. Laws §§ 16-2-9,16-2-11, 16-2-18, 16-2-34, or any related provisions of Title 16. Those statutes, however, "inherently" vest that power in the District.See Discussion, Part B, infra. As such, under the express language of the CBA, the right to judge the relative qualifications *Page 24 
of candidates for promotion is reserved to the District and cannot be the subject of grievance and arbitration.
B. The District's Statutory Duties
Assuming, arguendo, that the CBA allows for arbitration of the Superintendent's determination of the relative qualifications of candidates for promotion to English Department Chair at Central Falls High School, this Court next must decide whether judging those qualifications is a non-delegable, statutory duty that the District cannot bargain away or make subject to arbitration. This question implicates the well-settled precept that a school committee cannot delegate the powers conferred on it by the Legislature, absent legislative authority to do so. See State v. Rhode Island Council94, 925 A.2d 939, 945 (R.I. 2007); Dawson v. Clark, 93 R.I. 457, 461,176 A.2d 732, 723 (1962).
In addressing this issue, this Court must begin with the Rhode Island Supreme Court's 1975 decision in Belanger v. Matteson, 115 R.I. 332,346 A.2d 124 (1975), cert. denied, 424 U.S. 968 (1976) — a case on which the Union principally relies in arguing for arbitrability in this case. InBelanger, the Supreme Court dealt with an issue strikingly similar to the issue here. A panel of arbitrators had ruled that the School Committee violated the collective bargaining agreement in promoting a school teacher to department head over a teacher who was "equally qualified" and the more "senior candidate."[13] Id.115 R.I. at 353-54, 346 A.2d at 137. The trial court then reversed, finding that the arbitrators had exceeded their powers by violating the non-delegable statutory duties *Page 25 
assigned to school committees in the prior version of R.I.G.L. § 16-2-18
(1956), which provided, in pertinent part, as follows:
 [t]he selection of teachers and election of superintendent . . . and the entire care, control, and management of all the public schools interests . . . shall be vested in the school committees. . . .
Id. 115 R.I. at 354, 346 A.2d at 138. (emphasis added). On appeal, the Supreme Court reversed and reaffirmed the decision of the arbitrators, concluding that they did not violate any non-delegable statutory duties assigned to the School Committee. Id.
The Supreme Court's decision in Belanger reflects two guiding precepts in determining whether statutory duties assigned to school committees are delegable. First, the court must construe the statute at issue strictly to determine whether it explicitly vests certain duties exclusively in the school committee. Id. 115 R.I. at 353,346 A.2d at 136-137. The Court in Belanger narrowly interpreted the initial phraseology of § 16-2-18, which vests the "selection of teachers . . . in the school committees," and determined that "selection" refers only to the school committee's initial hiring of teachers and not to their promotion. Belanger, 115 R.I. at 351-53, 346 A.2d at 136-37. It thus strictly construed that language as not assigning to school committees a non-delegable statutory duty to determine the qualifications of teachers for promotion. Id. 115 R.I. at 352, 346 A.2d at 136. As such, it found that the School Committee could delegate its powers to make promotional decisions as part of the collective bargaining process and make those decisions subject to grievance and arbitration.
The Supreme Court next held that, even if a statute could be read as explicitly vesting certain duties exclusively in the school committee, the legislative mandate for good faith collective bargaining between teachers and school committees contained in the *Page 26 
"Certified School Teachers' Arbitration Act," § 28-9.3-1, et seq.
— which post-dated § 16-2-18 — is so strong that a school committee nonetheless can negotiate over terms and conditions of employment absent "an explicit statutory provision which specifically bars a school committee from making an agreement as to a particular term or condition of employment." Id. 115 R.I. at 353, 346 A.2d at 136-137. It characterized a promotional decision as a "term or condition of employment" that could be delegated by a school committee because § 16-2-18 does not specifically bar school committees from bargaining with teachers over promotional decisions. Id. 115 R.I. at 353-354,346 A.2d at 136-137. While not explicitly deciding whether the language of § 16-2-18, which broadly vests "the entire care, control, and management of all the public schools interests . . . in the school committees," could be construed strictly to make promotional decisions non-delegable duties of the school committee, the Court declined to read the statute that way given the broad mandate for good faith bargaining under the Certified School Teachers' Arbitration Act and the absence of any explicit statutory prohibition on the right of school committees to bargain over promotional decisions. Id. 115 R.I. at 353,346 A.2d at 136-137.
The rationale of the majority drew a sharp rebuke from Justice Paolino in dissent. He contended that § 16-2-18 and the Certified School Teachers' Arbitration Act, § 28-9.3-1, et seq., could be read in harmony by allowing only terms and conditions of employment, as opposed to matters of management and educational policy vested exclusively in the discretion of the school committee, to be arbitrated. Id.115 R.I. at 359, 346 A.2d at 139. He concluded that a decision of a school committee to promote one teacher over other applicants to the position of department chairperson, based on a *Page 27 
determination that, in its discretion, the teacher appointed was most qualified, is not arbitrable. Id. 115 R.I. at 366, 346 A.2d at 143. Promotional decisions, in his view, were committed to the discretionary judgment of school committees by the provision of § 16-2-18 delegating the selection of teachers exclusively to them and by the provisions of the applicable collective bargaining agreement making such decisions discretionary. Id. 115 R.I. at 362, 346 A.2d at 141 (citing Board ofEduc. v. Rockford Educ. Ass'n, 3 Ill. App.3d 1090, 280 N.E.2d 286 (1972) (holding that a discretionary determination of qualification for promotion of teacher to position of Director of Personnel and Recruitment is non-delegable and hence not subject to arbitration)). According to the dissent, in allowing the matter to proceed to arbitration, the arbitrators were allowed to supplant their judgment for that of the school committee, in violation of the power vested exclusively in the school committee to make discretionary promotional decisions.[14]
The majority opinion in Belanger was a high water mark for union rights in collective bargaining in the decisions of our Supreme Court; however, in its decisions from 1991 to date[15] — culminating in its recent bellwether decision in North Providence School Committee v. NorthProvidence Federation of Teachers, 945 A.2d 339 (R.I. 2008) — the Supreme Court has eviscerated the two delegability precepts underpinning *Page 28 Belanger. Indeed, it could be posited that the Court has overruledBelanger sub silencio and adopted the rationale of Justice Paolino in dissent.
First, this Supreme Court precedent has unraveled the first ofBelanger's delegability holdings — namely, that duties imposed on school committees by statute must be strictly construed and that the statute must explicitly impose a duty on a school committee in order to find non-delegability and arbitrability (in the absence of an explicit grant of the power to delegate that duty). See n. 17, infra (collecting cases). In North Providence School Committee, in contrast toBelanger, the Supreme Court read § 16-2-18 broadly to delegate to school committees "expansive powers over education." 945 A.2d at 347. It noted the especially forceful language employed in the statute that vests in school committees "the entire care, control, and management of all public school interests." Id. at 346. The Court even went so far as to elevate the duties imposed on school committees from a purely statutory level to a constitutional dimension — stating that Article 12, section 1
of the Rhode Island Constitution expressly imposes on the General Assembly the duty of promoting education[16] and that § 16-2-18
reflects the Legislature's delegation to school committees of that constitutionally derived duty. Id. at 347.
In reliance on case law handed down after Belanger, the Supreme Court observed that "[i]t goes without saying that [duties of school committees that] may not be made the subject of the arbitrable process" include not only those "statutory duties that are *Page 29 
specifically imposed upon school committees by law" but also those "activities closely associated therewith." Id. at 346 (emphasis added).[17] Prior case law, cited by the Supreme Court in NorthProvidence School Committee, reveals that the Supreme Court intended that "activities closely associated [with statutory duties]" include instances where the delegation of a term or condition of employmentinterferes with a broad grant of legislative authority. See,e.g., Pawtucket School Committee, 652 A.2d at 972 (holding that School Committee's ability to require teachers of English as a Second Language to submit lesson plans was a non-delegable duty because delegation would interfere with its statutory duty to "evaluate ESL programs and determine whether they conform with state law and the rules and regulations promulgated by the Board of Regents for Elementary and Secondary Education"). *Page 30 
According to the Supreme Court, "school committees are vested with a plethora of powers and responsibilities that relate to the essence ofthe educational mission that may not be bargained away."945 A.2d at 346. (emphasis added). While the Supreme Court did not define the scope of these powers and responsibilities, it suggested that concept should be interpreted expansively:
 In enacting Title 16, the General Assembly delegated to the school committees . . . expansive powers over education; it spoke in extremely broad terms when it vested authority in the public schools in the state's several school committees. It is true that the sweeping language of Title 16 must be read in harmony with the provisions of the Michaelson Act; it is nonetheless a basic rule of law that school committees are not at liberty to bargain away their powers and responsibilities with respect to the essence of the educational mission. In our view, in this case we are figuratively standing on the banks of the Rubicon: a very strong argument can be made that a decision about having or not having a composition period for teachers of English is directly related to the essence of the educational mission and is therefore non-arbitrable.
Id. at 347. It strongly implied, in dicta, that educational decisions cannot be arbitrated, while terms and conditions of employment unrelated to the educational mission (such as changes in workload and work conditions based on economics) are arbitrable. Id. The Supreme Court stated that had the School Committee eliminated the English Composition period at issue in that case for "the [stated] purpose of improving the education" of students, instead of economic reasons, then it is entirely possible, in fact the language suggests probable, that such a decision would not be arbitrable. Id.
The Supreme Court's allusion in North Providence School Committee to standing on the banks of the Rubicon signals that the Supreme Court may be poised to cross the river. It appears ready to commit itself irrevocably to a new course of action of deeming *Page 31 
non-arbitrable many decisions of school committees made in the name of education (and perhaps decisions implicating the prerogatives of management generally in the public sector) that were previously the subject of collective bargaining.[18]
In addition, the Rhode Island Supreme Court has eviscerated the second holding of Belanger that requires an explicit statutory provision barring a school committee from making an agreement as to a particular term or condition of employment to find non-delegability. Id.,115 R.I. at 353, 346 A.2d at 136. In both Pawtucket School Committee v. PawtucketTeachers Alliance, 652 A.2d 970 (R.I. 1995), and Woonsocket Teacher'sGuild v. Woonsocket School Committee, 770 A.2d 834 (R.I. 2001), the Court concluded that the terms and conditions of employment at issue could not be bargained away because delegability would interfere with the school committee's broad statutory duties. 652 A.2d at 971;770 A.2d at 838. To reach this conclusion, the Court did not require the presence of an explicit statutory provision preventing delegation, as it had inBelanger. Id. Similarly, in North Providence School Committee, the Supreme Court made no mention of the requirement of an express statutory provision preventing delegation to find non-delegability. See generallyBelanger, 115 R.I. 332, 346 A.2d 124. Indeed, the Supreme Court did not even cite to Belanger in any of these cases.[19] *Page 32 
Under the dictates of North Providence School Committee, therefore, the duties imposed on school committees by law must be construed broadly to include not only the duties described by statute but "all activities closely associated therewith." 945 A.2d at 346 n. 12. If those duties and activities relate to "the essence of the educational mission," they may not be bargained away.[20] Id. *Page 33 
In applying these precepts here, this Court first must review the duties imposed on the District by statute to determine if the Interim Superintendent's decision to promote DeLeo to English Department Chair, based on his discretionary determination that DeLeo was the most qualified candidate for promotion, is one that the District is empowered exclusively to make by law that cannot be bargained away. The most important statutory source of the District's power is the broad, firm directive contained in § 16-2-18 that vests "the entire care, control, and management of all the public school interests . . . in the school committee." Under this statute, all management decisions are vested exclusively in the school committee. In addition, that statute provides that "the selection and appointment of teachers and other school department personnel shall be made by the superintendent with the consent of the school committee." § 16-2-18. It thus grants the superintendent authority over the selection and appointment of teachers and other school department personnel.
Section 16-2-9(a), which outlines the general powers and duties of school committees, reiterates the broad language of § 16-2-18 that vests in the school committee "the entire care, control, and management of all public school interests." This reiteration emphasizes the Legislature's intent that all management decisions concerning the public schools be made exclusively by the school committee. This statute also grants the school committee the power to "identify the educational needs of the community" and "[t]o develop education policies to meet the needs of the community," the "responsibility for the care and control of local schools, "overall policy responsibility for the employment . . . of school department personnel," the duty "[t]o give advice and consent on the appointment by the superintendent of all school department personnel," the power "[t]o *Page 34 
establish minimum standards for personnel" and the duty "[t]o establish standards for the evaluation of personnel." §§ 16-2-9(a)(1), (2), (5), (6), (13), (14), (15). These provisions indicate that employment decisions made by the superintendent, with the consent of the school committee, are tied intimately to the school committee's standards for personnel, its view of the educational needs of the community and its educational policies.
Section 16-2-11(a), which outlines the general powers and duties of the superintendent, reiterates many of the provisions of § 16-2-18, in that it gives the superintendent the responsibility, under the direction of the school committee, for the "care and supervision of the public schools" and the "appointment of employees of the district."[21] It also makes the superintendent the "chief administrative agent for the school committee" with "administrative responsibility for the school system." §§ 16-2-11(a), (a)(5).
In addition, the superintendent has the duty to "implement policies established by the school committee, "recommend educational plans, policies, and programs to meet the needs of the district," and "recommend policies governing curriculum, courses of instruction [and] textbooks." §§ 16-2-11(a)(1), (2), (3). These provisions command that the superintendent, under the direction of the school committee, not only appoints employees but has the duty to ensure that those employees carry out the policies and follow the curriculum that the superintendent is charged with developing and following.
Finally, § 16-2-34(a) establishes a board of trustees to govern the underperforming Central Falls School District and assigns to it the same powers and duties assigned to *Page 35 
school committees. It also assigns the board of trustees broader power to "develop staffing policies which ensure that all students are taught by educators of the highest possible quality." § 16-2-34(a). The statute makes the superintendent serve at the pleasure of the board, and it assigns to the superintendent many of the same powers outlined in § 16-2-11.
In addition, the statute grants the superintendent of the Central Falls School District broader statutory powers than other superintendents, including "the responsibility . . . to manage and operate the school[s] on a day-to-day basis," the power "to appoint all . . . school personnel" (other than assistant and associate superintendents), without imposing a statutory requirement for consent of the board, the duty to "establish a school based management approach for decision making for the operation of the school" and the power to "establish appropriate advisory committees . . . to provide guidance on new directions . . . on the operation of the schools." Id.
§§ 16-2-34(h), (h)(3), (h)(5), (h)(8). These provisions indicate that the Legislature has granted the District even greater powers with regard to the hiring of personnel and management of the schools than it has assigned to other school committees and superintendents in the State.
A fair reading of these statutory provisions of Title 16 compels this Court to conclude that the General Assembly has vested broad power in the Superintendent of the Central Falls School District to appoint all school department personnel. See §§ 16-2-34, 16-2-18, 16-2-11, 16-2-9. The term "appoint" means to "designat[e] a person . . . for a job or duty." Black's Law Dictionary at 96 (7th ed. 1999). It means "to designate by authority" or "to name or select for an office [or] position." Webster's New Universal Unabridged Dictionary at 90 (2d ed. 1983). The term "select" means: "chosen in *Page 36 
preference to another or others; picked out, especially for excellence or some special quality; [or] picked." Id. at 1644. There is nothing in these definitions that limits the Superintendent's designation, selection or appointment of personnel to the initial hiring of teachers; thus, even though the statute does not explicitly grant the Superintendent the power to "promote" personnel, the specific statutory power to "appoint all school department personnel" must be read expansively to encompass the hiring, promotion and assignment of all school department personnel.[22]
Moreover, even if this Court were to construe the appointment language of the statute as not encompassing the power to promote, that power can be implied from the other statutory powers granted the superintendent. After all, in addition to the power to appoint all school department personnel, the Superintendent has responsibility for the care and supervision of the public schools and the responsibility to manage and operate the schools on a day-to-day basis (§ 16-2-11); the duty to formulate and implement educational plans, policies, and programs to meet the needs of the District, including policies governing curriculum, courses of instruction and textbooks (§§ 16-2-11(a)(1), (2), (3)); and the responsibility to establish, for Central Falls High School, a school based management approach for decision making in the school (§16-2-34(h)(5)). All of these duties relate to "the essence of the educational mission:" ensuring that the schools are managed properly and employ those teachers and administrators necessary to *Page 37 
ensure the best education for the students. North Providence SchoolCommittee, 945 A.2d at 346.
Thus, even if these duties do not expressly include the power of the Superintendent to appoint or promote persons to the position of English Department Chair, this power is certainly "closely associated" with those statutory powers so as to be implied. Id. The Superintendent must ensure that the candidate chosen for promotion to English Department Chair is the person best able to perform the management duties of that position as well as to assist the Superintendent in complying with his or her statutory duties. Notably, the English Department Chair is part of the Superintendent's required school based management team for Central Falls High School, acts as an agent of the Principal and serves as a liaison between the Principal and the teachers in the English Department. See n. 11, supra. The Department Chair must be able to implement the District's policies at the school level, suggest innovations in educational programs and curriculum, prepare the Department's budget, assist in the hiring, training, assignment, management, supervision and evaluation of the teaching staff, and oversee student placement. Id. The success of the Superintendent in fulfilling his or her statutory duties to elevate education in the School District is thus intimately tied to the performance of the English Department Chair.
It necessarily follows that the Superintendent must be able to make a judgment call as to the person best qualified to serve in that position. Indeed, it is hard to see how the Superintendent could fulfill his or her statutory management duties without the discretionary power to decide who to promote. *Page 38 
Accordingly, the Superintendent's good faith discretionary determination of which applicant is best qualified to be appointed to English Department Chair relates to "the essence of the educational mission." North Providence School Committee, 946 A.2d at 347. UnderNorth Providence School Committee, therefore, it is a power that is non-delegable and cannot be bargained away. Consistent with the CBA, the Superintendent's good faith exercise of judgment and discretion in determining the most qualified candidate for promotion is final and binding on the parties. It ensures that the Superintendent will be held accountable for his or her promotional decision. To allow such a discretionary decision to be arbitrated would be improper, as it would allow an arbitrator to substitute his or her discretion as to relative qualifications for promotion for that of the Superintendent.[23]
Permitting an arbitrator to become, in essence, a super-Superintendent would be a violation of §§ 16-2-9, 16-2-11, 16-2-18 and 16-2-34, as it would impermissibly delegate to the arbitrator power that the General Assembly vested *Page 39 
exclusively in the Superintendent and District.[24] It would thwart "the essence of the educational mission" by negating the prerogatives of management. Id.
It is also clear that allowing an arbitrator to substitute his or her judgment here for that of the Interim Superintendent would not only impermissibly limit the discretion of the Superintendent, but it also would detract from the Superintendent's ability to carry out his statutory duty of selecting the best qualified candidate for promotion to English Department Chair. Such a result is troubling, as:
 the very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiation, where citizen participation is precluded. This Court would be most reluctant to sanction collective agreement on matters which are essentially managerial in *Page 40 
nature, because the true managers are the people. Our democratic system demands that governmental bodies retain their accountability to the citizenry.
Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.,393 A.2d 278, 287 (N.J. 1978).
Here, the people have entrusted the Superintendent with both the "duty" and the "responsibility" to appoint school personnel through the enactment of § 16-2-34(h)(3). Allowing an unaccountable arbitrator to override the Superintendent's statutory authority to determine which individual shall be promoted would vitiate the explicit will of the people who have delegated that power to the Superintendent alone. This Court will not countenance such a result. As such, this Court finds that the Union's disagreement as to the Interim Superintendent's determination of an individual's qualifications for promotion — or the Union's dissatisfaction with the reasons given for that decision — do not constitute an arbitrable dispute.
Even though this Court has found that the Superintendent's determination of the relative qualifications of the candidates for English Department Chair is not arbitrable, it still must address whether this matter nonetheless should proceed to arbitration. The Union argues that arbitration is necessary to determine whether the Interim Superintendent's decision to promote DeLeo was in furtherance of the "essence of the educational mission," i.e., whether that promotion was for a purpose other than advancing the candidate who the Superintendent thought was most qualified.[25] It suggests that the Supreme Court's decision in North Providence School Committee supports arbitrability *Page 41 
here because, in that case, the Court determined the question of arbitrability only upon review of the arbitration record, following submission of the dispute to arbitration. It contends, therefore, that an arbitration proceeding is needed to determine whether the Superintendent's decision was in furtherance of the educational mission when he promoted DeLeo.
The Union did not proffer its argument that the Superintendent's decision was unrelated to the essence of the educational mission, however, until after North Providence School Committee conclusively foreclosed its ability to arbitrate relative qualifications.[26] Its veiled and conclusory argument in that regard is not a claim that the discretionary promotional decision of the Interim Superintendent had nothing to do with the educational mission of the School District. While the Union has made broad claims that the Interim Superintendent violated the CBA in promoting DeLeo, [27] the Union has failed to allege any facts and circumstances which would indicate that the promotion of DeLeo was unrelated to the educational mission.[28] It has failed to suggest that the Interim *Page 42 
Superintendent's stated reasons for choosing one candidate over the other — namely their relative leadership strengths — were not reflective of his judgment or that he acted in bad faith in making his promotional decision.[29] The record of grievance hearings and the memoranda filed here in support of its request for arbitration show that the Union simply takes the position that O'Neil was at least as qualified for the promotion as DeLeo such that, under the CBA, she should have received the promotion, rather than DeLeo, based on her seniority.[30]
Thus, when it argues that the matter needs to proceed to arbitration to determine factually, whether promoting DeLeo over O'Neil furthers the educational mission, it is really suggesting that, in its view, the appointment of O'Neil over DeLeo is the decision that best would further the educational mission. It therefore asks, improperly, that an arbitrator supplant his or her judgment as to relative qualifications for the discretion exercised by the Interim Superintendent in making that assessment when he made his promotional decision. *Page 43 
This Court needs no record, however, to determine that the Interim Superintendent's discretionary choice of English Department Chair is in furtherance of the educational mission. In this Court's view, the relative assessment of promotional qualifications for the position of English Department Chair, made in good faith by the Superintendent, is related per se to the essence of the educational mission. See Decision at 27-31, supra.
Non-arbitrability in such circumstance is supported by NorthProvidence School Committee, in which the Supreme Court stated that if the "elimination [of the English composition period] was undertaken for the purpose of improving education . . . it is entirely possible that we would have considered the administrative decision to be non-arbitrable."945 A.2d at 347. Similarly here, the Interim Superintendent's good faith assessment of relative qualifications of candidates for promotion is a decision that is directly related to the essence of the educational mission and thus must be deemed non-arbitrable.[31]
C. The Commissioner's Powers
Further support for this Court's finding of non-arbitrability can be found in R.I.G.L. § 16-7.1-5, entitled "Intervention and Support for Failing Schools," which *Page 44 
provides broad statutory authority for progressive support and intervention by the State to remediate failings in the public schools:
 . . . If after three years of support there has not been improvement . . . then there shall be progressive levels of control by the Department of Elementary and Secondary Education over the school and/or district budget, program and/or personnel. This control . . . may be exercised in collaboration with the school district and the municipality. If further needed, the school shall be reconstituted. Reconstitution responsibility is delegated to the Board of Regents and may range from restructuring the school's governance, budget, program, personnel and/or may include decisions regarding the continued operation of the school. . . .
Pursuant to this statute, and the federal No Child Left Behind Act,20 U.S.C. § 6301 et. seq., the Rhode Island Department of Education has imposed a corrective action plan on the Central Falls School District as a result of it failing to make adequate yearly progress as measured by student performance on state assessments. As part of that corrective action plan, Commissioner McWalters specifically outlined the requirements for department chairpersons at Central Falls High School for the 2007-08 school year. Those requirements state:
 Role of High School Department Chairs. It is essential that The high school principal have a well-prepared and effective Leadership team in addition to his assistant principals to support The implementation of new instructional practice in each classroom. CFSD must develop a process that transforms the role of high school department chair into one of peer leadership and support. . . .
See Letter dated Feb. 29, 2008 to Stephen M. Robinson. As it appears that the Interim Superintendent made his promotional decision in advance of this directive but nonetheless chose the candidate who he thought displayed the strongest leadership skills, allowing an arbitrator to supplant his judgment in that regard could run afoul of the Commissioner's directives in the corrective action plan and state law. *Page 45 
 IV. Conclusion
For the reasons set forth in this Decision, this Court grants the plaintiffs' motion for summary judgment. This Court declares, pursuant to R.I.G.L. § 9-30-1, that the Interim Superintendent's decision to promote Steven DeLeo to the position of English Department Chair is a non-arbitrable dispute. The defendant is enjoined, therefore, from proceeding with arbitration.
Counsel shall confer and submit forthwith to this Court for entry an agreed upon form of order and judgment that is consistent with this Decision.
[1] It is unclear to this Court whether DeLeo is also a member of the Union and, if so, why the Union chose to represent O'Neil over DeLeo.
[2] Pursuant to Rhode Island law, the Rhode Island Commissioner of Elementary and Secondary Education has the authority to assert control over schools that have failed to improve after three years of support.See R.I.G.L. § 16-7.1-5. The Commissioner may require corrective action and assert control over the underperforming school, the district budget, and personnel. Central Falls High School has been subject to such corrective action since December 2005, and the District has been subject to such corrective action since March, 2007.
[3] On July 2, 2008, with the scheduled arbitration imminent and this Decision nearing completion, this Court issued an order enjoining the scheduled arbitration. The Order stated: "After consideration of the plaintiffs' motion for summary judgment and its related requests for declaratory and injunctive relief, the defendant's opposition thereto, the extensive memoranda, exhibits and oral argument of the parties, and the recent decision of the Rhode Island Supreme Court in NorthProvidence School Committee v. North Providence Federation ofTeachers, 945 A.2d 339 (R.I. 2008), issued while this Court had this matter under advisement, this Court enjoins the pending arbitration of the dispute underlying this action concerning the District's determination of the relative qualifications of the candidates for promotion to the position of Central Falls High School English Department Chair on the grounds that it is non-arbitrable."
[4] Section 16-2-9, "General powers and duties of schoolcommittees," provides, in pertinent part, as follows:
 (a) The entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns. School committees shall have, in addition to those enumerated in this title, the following powers and duties:
 . . .
 (3) To provide for and assure the implementation of federal and state laws, the regulations of the board of regents for elementary and secondary education, and of local school policies, programs, and directives.
 . . . (5) To have responsibility for the care and control of local schools.
 (6) To have overall policy responsibility for the employment and discipline of school department personnel.
 . . . (13) To give advice and consent on the appointment by the superintendent of all school department personnel.
 (14) To establish minimum standards for personnel, to adopt personnel policies, and to approve a table of organization.
 (15) To establish standards for the evaluation of personnel.
 . . . (23) To delegate, consistent with law, any responsibilities to the superintendent as the committee may deem appropriate.
 (b) Nothing in this section shall be deemed to limit or interfere with the rights of teachers and other school employees to collectively bargain pursuant to chapters 9.3 and 9.4 of title 28 or to allow any school committee to abrogate any agreement reached by collective bargaining.
[5] 4 Section 16-2-11, "General powers and duties ofsuperintendent," assigns to the Superintendent the following duties, among others:
 (a) . . .
 (7) To appoint all school department personnel with the consent of the school committee.
 (8) To administer the personnel function of the school department consistent with personnel standards, policies, and the table of organization established by the school committee.
 (9) To provide for the evaluation of department personnel.
 (b) Nothing in this section shall be deemed to limit or interfere with the rights of teachers and other school employees to collectively bargain pursuant to chapters 9.3 and 9.4 of title 28, or to allow any school superintendent to abrogate any agreement reached by collective bargaining.
[6] Section 16-2-18, "Selection of teachers and superintendent —General control of schools," provides, in pertinent part:
 The selection of superintendent, in any city or towns that do not unite for the employment of a superintendent, and the entire care, control, and management of all the public school interests of the several cities or towns, shall be vested in the school committee of the several cities or towns. . . . the selection and appointment of teachers and other school department personnel shall be made by the superintendent with the consent of the school committee.
[7] Section 16-2-34, "Central Falls School District board oftrustees," provides in, pertinent part:
 (a) There is hereby established a . . . board of trustees, which shall govern the Central Falls School District. With the exception of those powers and duties reserved by the commissioner of elementary and secondary education, and the board of regents for elementary and secondary education, the board of trustees shall have the powers and duties of school committees.
 . . .
 (f) . . . The board of trustees shall have broad policy making authority for the operation of the school, as well as the following powers and duties: (5) To develop staffing policies which ensure that all students are taught by educators of the highest possible quality.
 . . .
 (h) It shall be the responsibility of the superintendent to manage and operate the school on a day-to-day basis. The superintendent's duties shall include the following:
 (1) To be responsible for the care, supervision, and management of the schools;
 . . .
 (3) To present nominations to the board of trustees for assistant and associate superintendents and to appoint all other school personnel;
 (4) To provide for the evaluation of all school district personnel;
 (5) To establish a school based management approach for decision making for the operation of the school;
 . . .
 (i) Nothing in this section shall be deemed to limit or otherwise interfere with the rights of teachers and other school employees to bargain collectively pursuant to chapters 9.3 and 9.4 of title 28 or to allow the board of trustees or the superintendent to abrogate any agreement by collective bargaining.
[8] Sections 16-2-9(b), 16-2-11(b) and 16-2-34(i) all state:
 Nothing in this section shall be deemed to limit or otherwise interfere with the rights of teachers and other school employees to bargain . . . or to allow the board of trustees or the superintendent to abrogate any agreement by collective bargaining.
[9] This section of the CBA expresses a preference for applicants to hold a master's degree in the subject area and/or a Master of Arts in Teaching and/or secondary administration, to hold a valid Rhode Island teaching certificate in English at the secondary level, and to have had at least three years of teaching experience in the Central Falls system. If no candidate holds such a master's degree, it allows an applicant to be chosen who is properly certified and has taught within the English Department at Central Falls High School for at least 3 years, provided that person obtains a master's degree within 3 years. If no such candidate with 3 years teaching experience in the English Department at Central Falls High School shall apply, the CBA allows an applicant to be chosen from outside the Department or school system, as long as he or she has had at least 3 years of teaching experience. At a minimum, therefore, the CBA requires the applicant to have or obtain within 3 years the requisite master's degree, hold a valid Rhode Island teaching certificate in English at the secondary level, and have had 3 years of teaching experience.
[10] This Court saves for another day the question of whether that dispute nonetheless would be non-arbitrable on the grounds that it interferes with a non-delegable statutory duty.
[11] These "duties" include: acting as agent between the Principal's office and all teachers of the Department; performing all duties required by the Principal; developing departmental curriculum and providing for the in-service training of teaching staff to meet the new standards; supervising and evaluating staff members, interviewing candidates for teaching vacancies and assisting in the orientation of new staff members; maintaining a continuous study of student progress to determine the degree of achievement, the effectiveness of the instruction, and the needs of students; making recommendations for program improvement based on this data; and overseeing the administration of the Department.
[12] It should be noted that Narragansett School Committee v.NEA/Narragansett, 2005 R.I. Super. LEXIS 68 (R.I.Super. 2005) (Lanphear, J.), a case relied on heavily by the Union in arguing that this dispute is arbitrable under the CBA, is distinguishable. There is no indication in that case that the CBA at issue there contained language similar to the provisions of the CBA in this case that makes discretionary promotional decisions, decided in good faith, final and binding, absent an explicit provision of the CBA to the contrary. In addition, there is no evidence that the parties raised, or that the Court considered, the issue of interpretation of the CBA raised by the parties and addressed by the Court here.
Moreover, this Court does not interpret the language of the CBA as barring arbitration of any promotional dispute. It just stops short of holding, as did the Court in Narragansett School Committee, that the CBA allows any promotional dispute to be grieved and arbitrated. In addition, that case was decided before the Rhode Island Supreme Court's recent pronouncements on arbitrability of educational disputes inNorth Providence School Committee, 945 A.2d 339 (R.I. 2008).See n. 20, infra.
[13] The collective bargaining agreement in Belanger contained language similar to the language of the CBA in the instant case. It provided that "[candidates] shall be recommended on the basis of qualifications for the position. Where qualifications are considered equal, seniority in the [school system] shall prevail."Belanger, 115 R.I. at 364-365, 346 A.2d at 142.
[14] Perhaps based on the strength of this dissent and the majority's somewhat tortured statutory construction, the School Committee inBelanger sought review of the decision by filing a petition for issuance of a writ of certiorari from the United States Supreme Court, which the high court denied. Belanger v. Matteson, 424 U.S. 968 (1976).
[15] See n. 17, infra (citing Vose v. R.I. Brotherhood of CorrectionalOfficers, 587 A.2d 913, 915 (R.I. 1991); Pawtucket School Committee v.Pawtucket Teachers Alliance, 652 A.2d 970, 972 (R.I. 1995); R.I. Dept.of Mental Health and Hospitals v. Rhode Island Council 94, 692 A.2d 318,324 (R.I. 1997); Rhode Island Department of Children Youth and Familiesv. R.I. Council 94, 713 A.2d 1250, 1256 (R.I. 1998); WoonsocketTeacher's Guild v. Woonsocket School Committee, 770 A.2d 834, 838 (R.I. 2001); Department of Corrections v. Rhode Island Brotherhood ofCorrectional Officers, 867 A.2d 823, 831 (R.I. 2005)).
[16] Article 12, section 1 of the Rhode Island Constitution states, as follows:
 The diffusion of knowledge, as well as the virtue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools . . . and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education.
[17] See Dept. of Corrections v. R.I. Brotherhood of CorrectionalOfficers, 867 A.2d 823, 831 (R.I. 2005) (holding that the Department of Corrections could not negotiate away the determination of "just cause" firings to an arbitrator because it may interfere with the Department's statutory responsibility to maintain "security, safety and order at all state correctional facilities"); Woonsocket Teacher's Guild v.Woonsocket School Committee, 770 A.2d 834, 838 (R.I. 2001) (stating that disputes over workload increases that interfere with Board of Regents Regulations 300.1, 300.2(b)(1)(i) and 300.24(12) — requiring comparable health services for special education students — were non-arbitrable because arbitration would hinder the School Committee's general duty to "provide for and assure the implementation of federal and state laws, the regulations of the board of regents for elementary and secondary education, and local school policies, programs, and directives");R.I. Dept. of Children, Youth and Families v. R.I. Council 94,713 A.2d 1250, 1256 (R.I. 1998) (holding that DCYF could not negotiate away its ability to establish "just cause" for termination because this determination fell within its basic statutory obligation "to promote, safeguard and protect the social well-being and development of children, and to make provisions and arrangements to care for each child under the [state's] supervision"); R.I. Dept. of Mental Health, Retardation andHospitals v R.I. Council 94, 692 A.2d 318, 324 (R.I. 1997) (declaring that the Director of MHRH could not delegate away the authority to limit consecutive shifts because doing so would interfere with the Director's statutory duty to "take all necessary steps to promote the health of patients . . . ensure the comfort of patients . . . and provide for their proper care"); Pawtucket School Committee, 652 A.2d 970, 972 (R.I. 1995) (holding that School Committee's ability to require teachers of English as a Second Language to submit lesson plans was a non-delegable duty because delegation would interfere with its statutory duty to "evaluate ESL programs and determine whether they conform with state law and the rules and regulations promulgated by the Board of Regents for Elementary and Secondary Education"); Vose v. R.I. Brotherhood ofCorrectional Officers, 587 A.2d 913, 915 (R.I. 1991) (holding that the Director of the ACI could not delegate his authority to force overtime, because doing so would interfere with the Director's broad statutory duty to "make and promulgate necessary rules and regulations incidental to the exercise of his power [to provide for] * * * safety, discipline, * * * care, and custody for all persons committed to correctional facilities").
[18] "Crossing the Rubicon" alludes to the illegal crossing of the Rubicon River in northern Italy by Caesar and his army to make their way to Rome — a crossing by which Caesar committed his troops irrevocably to a risky and revolutionary course of action and inevitable armed conflict. According to the historian Suetonius, Caesar there uttered the famous phrase "alea iacta est" — "the die is cast." To "cross the Rubicon" is to "pass the point of no return." See Victor Duruy,History of Rome, Vol. V (1883);http://en.wikipedia.org/wiki/Rubicon (citing Suetonius, The DeifiedJulius).
[19] Interestingly enough, Belanger has been cited by the Supreme Court over the years primarily for purposes other than its two delegability rules. See Chariho Regional School Committee v. CharihoTeachers' Ass'n, 447 A.2d 1140, 1142 (R.I. 1982) (citingBelanger for proposition that a school committee may bargain with teachers' unions); Barrington v. Int'l Brotherhood of Police Officers,Local No. 351, 621 A.2d 716, 718 (R.I. 1993) (citing case for the persuasiveness of federal labor law); Frost v. City of Newport, 706 A.2d 1354, 1355 (1998) (citing case in support of the standard of review of an arbitrator's decision); Macquattie v. Malafronte, 779 A.2d 633, 636
(R.I. 2001) (citing case on the issue of the failure of a union to adequately represent its members); City of Woonsocket v. Int'lBrotherhood of Police Officers, Local 404, 839 A.2d 516, 518 (2003) (citing case as authority for the State's public policy in favor of private settlement of collective bargaining grievances).
Indeed, Belanger has been cited only twice — over two decades ago — with respect to its two central tenets on delegability. See Cranstonv. Hall, 116 R.I. 183, 185, 354 A.2d 415, 417 (1976) (where the Supreme Court compared the Firefighters' Arbitration Act, § 28-9.1-1 etseq., to the Certified School Teachers' Arbitration Act, § 28-9.3-1et seq., to hold that a city may bargain away promotional procedures in its collective bargaining agreements with firefighters); Hebert v.Ventetuolo, 480 A.2d 403, 407 (R.I. 1984) (where the Supreme Court inexplicably interpreted Belanger as standing for the proposition that § 16-2-18 should be liberally construed when, in fact, the Court inBelanger narrowly construed the statute). Citations toBelanger are noticeably absent from North Providence SchoolCommittee and the long line of cases that it cited from 1991 forward concerning the non-delegability of statutory duties.
[20] The Union again relies on the Superior Court decision inNarragansett School Committee v. NEA/Narragansett, 2005 R.I. Super. LEXIS 68 (R.I.Super. 2005) (Lanphear, J.) — which found arbitrable the Union's claim that a teacher should have been promoted to assistant principal because she was at least as qualified as the candidate chosen — to argue that the promotional dispute at issue here is subject to arbitration. In that case, the Court rejected the proposition that the duties conferred on the School Committee under §§ 16-2-9 and 16-2-18
rendered the dispute non-arbitrable. Narragansett School Committee,supra, at *8.
This Court, however, finds Narragansett School Committee to be distinguishable from the case at bar. First, as noted previously, the CBA at issue here makes discretionary decisions of the Superintendent, such as promotions, final and binding. See Decision at 22 n. 12,supra. In addition, this Court is not suggesting that a promotional dispute can never be subject to arbitration, as it appears the School Committee argued in that case, Narragansett School Committee,supra, at 3; instead, it finds, as argued by the District, that a discretionary decision to promote based on a determination of the relative qualifications of a candidate is non-arbitrable. Id.
More importantly, the Superior Court decided that case before the Supreme Court's recent pronouncements in North Providence SchoolCommittee. The Supreme Court's recent case, in this Court's view, changes the playing field with respect to decisions of arbitrability in connection with public school employee contracts.
The Court in Narragansett School Committee recognized "the gravity of responsibilities conferred upon the School Committee by the legislature" in §§ 16-2-9 and 16-2-18 and commended the School Committee for "desir[ing] to retain a great degree of control over administrative practices." Narragansett School Committee, supra, at 8. Had it had the benefit of the Supreme Court's expansive view of those statutory powers in North Providence School Committee — namely, that the duties imposed on school committees by law must be construed broadly to include not only the duties described by statute but "all activities closely associated therewith" and that, if those duties and activities relate to "the essence of the educational mission," they may not be bargained away — the Court in Narragansett School Committee might well have reached the same conclusion as this Court as to the arbitrability of promotional disputes involving management discretion.
[21] See also § 16-2-11(a)(7) (superintendent has duty "[t]o appoint all school department personnel with the consent of the school committee"); § 16-2-11(a)(8) (superintendent has duty to "administer the personnel function of the school department consistent with the personnel standards [and] policies of the school committee"); § 16-2-11(a)(9) (superintendent has duty to "evaluat[e] . . . department personnel)."
[22] While the Court in Belanger construed the prior version of § 16-2-18 in a contrary fashion, narrowly interpreting the school committee's power over the "selection of teachers" as limited to an initial hiring, as opposed to their promotion, its holding in that regard no longer holds sway. First, the Legislature has since amended the statute to expand the superintendent's power beyond the "selection of teachers" to include the "appointment of teachers and other school department personnel." Cf. § 16-2-18 (1956) with § 16-2-18, P.L. 1988, ch. 336, § 1. In particular, with respect to the Central Falls School District, it has vested this power of appointment exclusively in the Superintendent. § 16-2-34(h)(3). Moreover, the Supreme Court now advocates interpreting the statute broadly to delegate to school committees "expansive powers over education." North Providence SchoolCommittee, 945 A.2d at 347.
[23] As stated by the Superior Court in Johnston School Committee v.Johnston Federation of Teachers, C.A. No. PC 97-4206 (R.I.Super. 1998) (Silverstein, J.) (bench decision) — a case in which the Court held that a decision by a Superintendent appointing a person as Assistant Principal, with the consent of the School Committee, was non-arbitrable:
 . . . it is manifest that the appointment of a principal must similarly fall within the school committee's exclusive non-delegable powers. It would not be consonant with the wide discretion in educational policy accorded school committees to rule that they can be hobbled with key educational supervisory personnel not of their own initial choosing.
Johnston School Committee at 6 (quoting Berkshire Hills Regional SchoolDistrict Committee v. Gray, 5 Mass. App. Ct. 686, 369 N.E.2d 736, 739
(Mass. 1977)) (emphasis added). While that Court, in passing, recognizedBelanger as still good law, it did not follow its tenets to find arbitrability. Indeed, it found that the Superintendent's appointment of the Assistant Principal was not only excluded from collective bargaining under the terms of the CBA at issue there, but also that such appointment was "solely within the responsibility of the [School Committee] as a matter of statute [including §§ 16-2-9, 16-2-11] and of public policy." Id. at 5. In these respects, its decision appears to have foreshadowed the Supreme Court's recent pronouncements inNorth Providence School Committee.
[24] The Union contends that R.I. Gen Laws §§ 16-2-9, 16-2-11, and16-2-34 cannot be used to abrogate the CBA, which it claims allows submission of all promotional disputes to arbitration, because each of these statutes contains the following language:
 Nothing in this section shall be deemed to limit or otherwise interfere with the rights of teachers and other school employees to bargain collectively pursuant to chapters 9.3 and 9.4 of title 28 or to allow the board of trustees or the superintendent to abrogate any agreement by collective bargaining.
See §§ 16-2-9, 16-2-11, and 16-2-34. There is nothing in this Court's interpretation and application of these statutes, however, that limits or interferes with the rights of teachers and school employees to bargain collectively or that abrogates any collective bargaining agreement. Here, the CBA, by agreement of the parties through collective bargaining, has limited the ability of these individuals to bargain over issues of judgment or discretion on the part of the Superintendent. Moreover, this Court does not rule that promotions may never be the subject of collective bargaining or arbitration; rather, a good faith promotional decision made by the Superintendent, based on a discretionary determination of the candidates' respective qualifications, is non-delegable and non-arbitrable.
In addition, notwithstanding the language of §§ 16-2-9, 16-2-11, and16-2-34, on which the Union relies, the Supreme Court has used § 16-2-9
to find a non-delegable statutory duty in a collective bargaining agreement. In both Pawtucket School Committee, 652 A.2d 970 (R.I. 1995), and Woonsocket Teacher's Guild, 770 A.2d 834 (R.I. 2001), the Supreme Court employed § 16-2-9 to undermine provisions within collective bargaining agreements that delegated a school committee's statutory authority, explicitly holding that a school committee cannot bargain away duties imposed on it by statute. In North Providence SchoolCommittee, the Court forcefully relied on § 16-2-9 — "an immensely important part of the General Laws" that vests in the school committees of Rhode Island's cities and towns "[t]he entire care, control andmanagement of all public school interests" — to expand the scope of a non-delegable duty. 945 A.2d at 346 (quoting § 16-2-9(a)) (emphasis in original). Thus, the provisions of §§ 16-2-9, 16-2-11 and 16-2-34 that assign powers to school committees and the superintendent may be used to find that they have non-delegable duties that cannot be bargained away, notwithstanding the limiting language in those statutes barring them from being interpreted to interfere with the right to bargain collectively or to abrogate any collective bargaining agreement.
[25] See Union's Objection to Motion to File Supplemental Memorandum Out of Time at 3 (suggesting that arbitration is required to determine the motive of the District in promoting DeLeo and whether that promotion might have been based on nepotism, discrimination, economic or other reasons that would not implicate any non-delegable duty to determine educational policy).
[26] Id. ("Indeed, at the arbitration hearing, the Union will submit evidence that the District's decision did not involve `the essence of the educational mission.'")
[27] The Union's "Statement of the Grievance" broadly states: "The Central Falls School District violated Article VI, Section 1, Promotions/Promotional Qualifications and Section 2, Department Chairs by not selecting Marie O'Neil as English Department Chair at Central Falls High School." The Union's October 25, 2007 memorandum, p. 10, states: "Here, the Union contends that Ms. O'Neil was unfairly treated and that the Central Falls School Committee misinterpreted, misapplied and violated the CBA. Specifically, the Union claims that Ms. O'Neil was equally or better qualified than Mr. DeLeo for the position of English Department Chair and that she has more seniority." The Union's November 1, 2007 reply brief, p. 2, states: "The basis of the Union's grievance is that the School Committee violated Article VI by failing to properly apply the qualifications to the candidates (The Union preserves its right to make other arguments and objections to the promotional process and the District's decision as allowed by the CBA.)"
[28] It has not argued, as did the Union in North Providence SchoolCommittee, for example, that the Superintendent made his decision for economic, rather than educational, reasons. Moreover, in that case, the Supreme Court was not asked to decide the question of arbitrability before arbitration. In dicta, however, it stated that "a very strong argument can be made that a decision about having or not having a composition period for teachers of English is directly related to the essence of the educational mission and is non-arbitrable." NorthProvidence School Committee, 945 A.2d at 347. Similarly here, a Superintendent's good faith assessment of relative qualifications of candidates for promotion is a decision that is directly related to the essence of the educational mission and is non-arbitrable.
[29] In North Providence School Committee, the Supreme Court stated that had the School Committee eliminated the English Composition period for "the purpose of improving the education" of students, instead of economic reasons, then "it is entirely possible" that such a decision "would be non-arbitrable." 945 A.2d at 347. It thus implied that a school committee's stated reasons for making a decision could be sufficient to find non-arbitrability with respect to that decision. Had it thought that arbitration would be required in all cases to determine the motive for the school committee's decision, it would not have raised the possibility of declaring the decision non-arbitrable in advance of arbitration.
[30] The September 14, 2006 grievance ruling states: "[t]he thoroughness of the responses provided by the other candidate as to the qualities of leadership and involvement needed by the incoming individual were sufficient to weigh the selection for English Department Chair in his favor." See also n. 27, supra.
[31] This Court takes no view as to whether the Union nonetheless has an alternate forum in which to press its grievance. See
§§ 16-39-1("Parties having any matter of dispute between them arising under any law relating to schools or education may appeal to the commissioner of elementary and secondary education. . . .") and 16-39-2 ("Any person aggrieved by any decision and doings of any school committee or in any other matter arising under any law relating to schools or education may appeal to the commissioner of elementary and secondary education);Pawtucket School Comm. v. Bd. of Regents for Elementary and SecondaryEduc., 513 A.2d 13, 16 (R.I. 1986) (holding that appeal of a decision of the Board of Regents for Elementary and Secondary Education is by way of common law certiorari); Slattery v. School Comm. of the City ofCranston, 116 R.I. 252, 263, 354 A.2d 741, 747 (1976) (holding that appeals from school committee actions to the Commissioner of Education under § 16-39-2 are de novo); Lawrence Altman. v. School Comm. of theTown of Scituate, 115 R.I. 399, 402-06, 347 A.2d 37, 38-40 (1975) (holding that § 16-39-3, providing for appeal and review by the Board of Regents, did not demonstrate legislative intent to give it de novo
review of decisions of Commissioner of Education but instead is consistent with limited scope of review).